[No. 7943.]

RIVERSIDE RESERVOIR & LAND COMPANY V. GREEN CITY IRRI-
GATION DISTRICT ET. AL.

1.  IRRIGATION—*Reservoirs—Legislative Regulation.* The state has such an
interest in the construction of reservoirs as to justify the statutory provi-
sions declaring what shall constitute proper construction, and when such a
structure is deemed complete. (Rev. Stat., sec. 3205.) (517, 518.)

2.  CONTRACT FOR THE CONSTRUCTION OF A RESERVOIR—*Interpretation.* The
provisions of the statute (Rev. Stat., sec. 3205) are to be read into every
contract for the construction or enlargement of a reservoir. (518.)

One agreeing to take shares in a reservoir company, in consideration of
the company's agreement to enlarge and complete its reservoir to a certain
capacity, cannot be required to accept the shares, until it is made to appear
that the statute has been complied with. (520, 521.)

3.  ESTOPPEL—*By Conduct.* Plaintiff owning water rights in a reservoir
company had agreed that, upon completion of the reservoir, they would
accept shares in the company. They attended a meeting of the stockholders
at which an assessment was levied upon the corporate stock,—not to partici-
pate as stockholders, but to protest as the owners of water rights. *Held,*
that plaintiffs were not by such attendance estopped to deny liability for
assessment. (519.)

The action of one plaintiff in the premises was no estoppel upon his
co-plaintiffs. (519.)

Plaintiffs in consideration that the reservoir company should construct
and complete its reservoir to a certain capacity, agreed to accept shares in
such company.

Afterwards the reservoir company circulated a petition for the organ-
ization of an irrigation district, the subscribers thereto agreeing to purchase
water rights, on condition that the corporation should enter into a contract
with such district for the enlargement of the reservoir, and should sell to
the district a specified number of water rights, to be paid for in bonds of
the district. Plans and specifications for the proposed enlargement were
attached to the petition. The reservoir company afterwards entered into
the proposed contract, with the district, in accordance with what was set
down in the petition. Some of the plaintiffs subscribed the petition, and
others attended meetings of the holders of water rights under the reservoir,
when the acceptance of the contract by the district was under consideration.
*Held* that plaintiffs were not estopped from an assertion of their rights under
the plain provisions of a previous contract. (524-527.)

*Error to Denver District Court.* Hon. GREELEY W. WHIT-
FORD, Judge.

Mr. T. M. MORROW, for plaintiff in error.

Mr. H. N. HAYNES, for defendants in error.

SCOTT, J., delivered the opinion of the court.

This action was by the defendants in error to enjoin the plaintiff in error from compelling the former to pay an assessment levied by the defendant company upon its capital stock, and to restrain the defendant company from refusing to deliver water to the plaintiffs, as water right owners, as a means of enforcing the payment of the assessment so levied.

The assessment was levied at a meeting of the stockholders of The Riverside Reservoir and Land Company, held on the 8th day of October, 1910.

The contention of the plaintiffs is that they were not stockholders of said corporation, and for such reason the levy is unlawful as to them.

On the 1st day of August, 1906, the said reservoir company was the owner of an irrigation reservoir, situated in Weld County, Colorado, which was commonly known as the Riverside Reservoir, together with outlet and inlet ditches, and embankments, dams and structures connected therewith, and with easements and water rights. The capital stock of the corporation was $300,000 and divided into 12,000 shares of $25.00 each. Upon and after the last named day, the reservoir company entered into separate written agreements with the plaintiffs for the sale of water rights. The agreements were all of like form. The dispute here involves the fifth paragraph of the agreement, as follows:

"FIFTH—It is further expressly understood and agreed that the party of the first part agrees to construct and will construct and complete said reservoir, and all inlet and outlet ditches and other works, to a capacity necessary to store 1,000,000 cubic feet of water for each right sold and outstanding; and it is agreed that when the entire capacity of

said reservoir has been exhausted by the sale of water rights fully paid up, or sooner, at its option, the company, party of the first part, may and shall distribute its capital stock on the ratio of four shares of stock for each such water right, to the owners of such water rights, the said shares, water rights, canal and reservoirs, with their appurtenances to be then free and clear of all debts, liens and incumbrances, and which party of the second part agrees to accept, subject at all times, nevertheless, to the burden and easement therein of all water rights sold as aforesaid, said stock to be issued to said subscribers pro rate on the water rights held by them respectively, and the party of the first part agrees to distribute among its stockholders the remaining stock for the then unsold water rights in the same proportion."

Plaintiffs contend that the company did not construct a reservoir of the capacity agreed; that it sold more water rights than agreed, or was justified by the capacity of the reservoir; that its reservoir was incomplete, insufficient, ineffective and defectively constructed, and that the corporation was burdened with debt at the time it sought to issue its stock to plaintiffs, and for such reasons plaintiffs were not bound to, and did not, accept any of the capital stock of the company, and were therefore not stockholders at the time of the levy of the assessment.

At the beginning of the sale of water rights under the agreements, the entire capital stock of the corporation was owned by six persons, one of whom owned but one share.

It appears that at the institution of this suit there had been sold 2,505 water rights, of which these plaintiffs owned 202½. A majority of the water rights, and of the stock, was owned by The Riverside Irrigation District, 1,253 of which water rights were acquired subsequent to the date of plaintiffs' contracts, under a construction agreement, and in addition to which were other individual contracts purchased by the district.

It will be observed that the said paragraph five, provided that the company was to complete its reservoir to a capacity sufficient to store 1,000,000 cubic feet of water for each right sold and outstanding, before the stock was to be distributed. Having sold 2,505 water rights, the capacity of the reservoir under the contracts must have been 2,505 million cubic feet.

Further, there is nothing within the water right contracts, to determine the method or manner of construction or completion of the reservoir, or as to what shall constitute such completion. Neither are there any plans or specifications suggested in such contracts. The reservoir was to be completed and to have a specific capacity only.

Section 3205, Rev. Stat. 1908, which was then and is now the law of the state, provides:

"Sec. 3205.    No reservoir of a capacity of more than seventy-five million cubic feet of water, or having a dam or embankment in excess of ten feet in vertical height, and covering an area of more than 20 acres shall hereafter be constructed in this state, except the plans and specifications of the same shall first be approved by the state engineer; and the state engineer shall act as consulting engineer during the construction thereof, and shall have authority to require the material used and the work of construction to be done to his satisfaction; and no work shall be deemed complete under the provisions of this act until the state engineer shall give to the owners of such structures a written statement of the work of construction and the full completion thereof together with his acceptance of the same, which statement shall specify the dimensions and capacity of such reservoir or reservoirs."

The reservoir so agreed to be constructed was to be of sufficient measurements and capacity as to clearly come within the requirements of the statute.

Obviously the state has such an interest in the construction of reservoirs as to justify the regulation as to what shall

constitute a proper construction, and as to how and when the same is to be deemed completed. Therefore the parties may not contract in violation of the statute, and the law must be read into the contract and become a part of it.

Doubtless, contracts may be entered into and enforced for the construction of a reservoir of such proportions, in such manner and of such materials as may be desired, but these must be limited by the provisions of the statute, that where the reservoir is of or above specified dimensions, the plans and specifications must be first approved by the state engineer; that such public official shall be the consulting engineer during the construction; that he shall have authority to require the material used and the work of construction done to his satisfaction, and the reservoir may be regarded as completed only when he has accepted the same and has so certified to the owners.

The legislature has determined that the public safety so requires, and all persons so contracting and constructing such a reservoir must be presumed to have done so with knowledge and in the light of the statute.

An examination of the briefs and the voluminous and unindexed abstracts of record, fails to disclose either allegation or proof that the provisions of the statute were in any manner or at all complied with.

It does not appear that the state engineer approved the plans and specifications, or that he acted as consulting engineer, or that he approved or accepted the structure, or that he certified as to the capacity of the reservoir. Therefore, the reservoir was not completed as agreed in the fifth section of the water right contract, and for such reason the plaintiffs were not obligated to accept the shares of the capital stock of the company, and were therefore not stockholders of the company at the date of the meeting.

It is contended that the plaintiffs attended the meeting of the stockholders at which the assessment was levied, and

for such reason are estopped from asserting that they were not stockholders.

It is quite clear that their purpose was to protest as owners of water rights, and not to participate as stockholders, and that they did not vote or act in the capacity of stockholders. The action of the stockholders was designed to affect their interests as owners of water rights. To be present, to object and to protest against such action was their right, if not their duty, in view of their conviction in the premises. Their action was personal, and not as stockholders.

It would be unreasonable to say that such conduct can have the effect to estop them from further asserting their objections and their claim of right in the courts.

It is true that the defendant company contends that two of the plaintiffs, who were small owners of water rights, did vote at the meeting, but we must assume that by the general finding of the court, this contention was not sustained. But if this be true, it can have no effect as bearing upon the action of any one of those who clearly did not participate as stockholders, and who are here contending.

The defendant filed an answer and cross complaint and prayed for relief as follows:

"FIRST:    That it may be adjudged and decreed that each one of the respective plaintiffs has been since the 20th day of August, 1910, and is now the owner of four shares of stock in this corporation for each and every water right held by him in the Riverside Reservoir.

SECOND:    That if it be adjudged that the respective plaintiffs are not the owners of the number of shares of stock issued to them or their grantors respectively, then and in that event that the court ascertain and determine who are at the time the legal owners of said capital stock and in what amount or proportion.

THIRD:    That judgment be entered against the owners of said stock severally for the amounts of the assess-

ments due on their respective water rights and shares of stock and that the same be declared a lien on their several water rights and shares of stock and that the same be sold for the payment and satisfaction of said several judgments and costs of this suit.

FOURTH: That this defendant be given such other and further relief as may be just and equitable, and that it have judgment against the plaintiffs for its costs herein expended."

It is not seriously contended by the defendant that the reservoir was completed, so that it had the available or usable capacity provided by the several contracts with the plaintiffs, or anything near the agreed capacity. The evidence is overwhelming that it did not.

It is agreed that 2,505 water rights were sold. Each water right under the contract was to represent one million cubic feet. The evidence does not show that there was or could be stored for use, at any time, more than fifteen hundred million cubic feet of water.

It is clear then, that not more than sixty per cent of the contracted amount was at any time available. Beside this, the evidence is conclusive that the reservoir was not constructed either in a safe or usable way, so as to store even the amount which it may so have at one time held. And it is certain that the state engineer refused to accept it as of a capacity of twenty-four hundred million cubic feet.

The prayer of the cross complaint was that the plaintiffs are and have been since the 20th day of August, 1910, the owner of four shares of stock for each water right held under the contract, and judgment be entered for the amount of the assessment; that such judgment be held to be a lien on such shares, and that the same be ordered to be sold in satisfaction of such judgment.

The cross complaint and this prayer impose upon the defendant the burden of showing a compliance with the contract. This the defendant has not done. In fact it has in-

troduced no testimony at all to show a compliance with the water contract. The only testimony in this respect was produced by the plaintiffs.

In August, 1909, the state engineer directed his deputy, Johnson, to make examination and report on the reservoir. The examination was made on August 15th, 1909, and the report dated August 20th, 1909. This report discloses many defects and insufficiencies. The following is a synopsis of some of the statements and conditions then appearing as gathered from the report:

"Per instructions, I inspected Riverside Reservoir Aug. 15, 1909.  *  *  *

It is in natural depression depth whereof is increased by earth dam with variable height from 5 to 20 ft., extending along southeastern, southern and southwestern edge for six miles. This dam is of very sandy loam. Slopes on outside face are three horizontal to one vertical and on the water face 1.5 horizontal to 1 vertical; top width is 16 ft.

Inside or water face has been lined with a layer of concrete, which varies at different places from 3.625 to 4 in. thick. Evident intention was to have this concrete reinforced with wire mesh, which should have been placed in center of the concrete; specifications so provided. This was not done, as can be seen, at all points where breaks occurred. The wire mesh was laid on slope of the freshly completed fill and the concrete thrown on top of it.

No effort was made, I am informed, to place this wire mesh in center of concrete. In its present position, the wire is useless. The wire is stuck to the bottom of the concrete, but at no place where I could see the underside of the facing was the wire imbedded out of sight.

There are now three large breaks in the facing where the water has beaten holes. One extends from top to bottom of facing, the other two are in its central part, but do not extend so far. These breaks have been filled with sacks of sand and earth; it was very difficult, I am informed, to save

bank from washing out when the break occurred last fall, during high northwest wind, lasting two or three days.

At about ten places breaks or washouts had occurred along the lower toe of facing, chiefly where the dam crosses small knolls and where the concrete was not of sufficient depth. The water has eroded these knolls and exposed the toe of facing. In some places large holes have been washed out in the concrete; these had been filled with sacks of earth and sand protected by short posts driven into bed of reservoir.

Material of bank is very fine, sandy loam, very difficult to pack properly, allowing water to seep through it very readily. * * *

In my opinion, the concrete facing was not properly constructed and should be entirely removed and replaced. Sufficient care was not taken in compacting the fill. Wire mesh was not placed in proper position; it should be placed near the center of the concrete. The toe of facing should be deeper, especially where the dam crosses knolls * * *. Care should be taken to repair earth dam at once."

Testifying this deputy state engineer said:

"I will say as an engineer from the actual conditions I saw, the dam was in an unsafe condition Aug. 15, 1909 * * *. I will say the water was about 18 or 20 ft. above the bottom of the outlet tube that day."

The state engineer testified concerning his action on this report as follows:

"As result of this report, I required further construction work to be done before I would approve the reservoir to impound 2,400 million feet as an accepted structure."

An engineer named Prince in the employ of the Union Pacific Railroad Company, whose line of track runs below the reservoir, reported April 21st, 1910, in substance:

"I hereby submit report of my observation * * * relative to Riverside Reservoir, requested in your letter of April 8th. The reservoir is of recent construction, last year,

1909, being first year of service.   The dam extends for distance of 4.5 miles.   Area of site ranges from 40 acres in extreme low water to 3,811 at high water.

Concrete facing.   The inner slope of bank- is ·paved with concrete facing, varying from 3.625 in. to 4 in.   Some wire mesh used in connection with the concrete was evidently intended as a reinforcement, but through carelessness in its placing, is of no practical value.   At the several breaks I inspected, this wire mesh is mostly entirely below the concrete, in places adhering to it, but adding no strength.   The concrete evidently was made from blow sand, not suitable for that purpose, which tends to detract from the strength of the mixture, as you well know.

Present conditions.   The embankment was built of fine, light sand, commonly called 'blow sand,' which is even finer and lighter than beach sand and not at all suitable for dam construction.   Result is, contour of top and lower slope is constantly changing, by shifting of sand under wind action.

Concrete facing is of light construction and evidently of insufficient strength to withstand pounding effect of wave action.   I counted nine holes in the concrete facing, some of which are 40 ft. in length, involving the entire slope from water to parapet wall and in one instance, washing the bank back of this wall.

Temporary relief.   I withdrew, with much hesitation, suggestion to lower the reservoir at least 5 ft. without delay, but if the present head of water is to be saved, it can only be done by careful application of all safeguards.

The concrete, as constructed, was deficient in accordance with those specifications (referring to specifications pertaining to contract with Riverside district), and it did not have heavy wire; chicken wire was used.   The wire did not conform to those specifications."

This witness testifying as to the condition and his conclusion as to capacity, said:

"As I saw the reservoir in April, 1910, it could not be used to store any water. There was water to a depth of 24 or 25 ft., but it was not in safe condition. Without expensive repairs, it was of no value at all, as an embankment to impound water. Would say it would be safe to impound water to a depth of 19 ft. in condition I first saw that embankment."

The reservoir at a depth of 19 feet would contain but a comparatively small proportion of the amount of water agreed where there were 2,505 water rights sold. State Engineer Comstock visited the reservoir in the spring of 1910, and examined it. His testimony as to its then condition is substantially as that of other engineers above quoted. He says that he required and secured further and subsequent reports by engineers, and refers particularly to one report made by his deputy, Johnson, jointly with Field and Prince, engineers, made July 27th, 1910, and testifies that from his examination made in the spring of 1910, and from the report of the engineers above referred to, dated July 27th, 1910, the reservoir was not in such a condition that it was safe to impound water, without additional reconstruction work, substantially as recommended by such engineers, and that he declined to approve or accept the construction.

But the defendant company, chiefly relies upon the contention that the construction and completion of the reservoir was accepted by the Riverside Irrigation District, and that this action for the reasons afterward stated, binds the plaintiffs.

It appears that the defendant company undertook to and did secure the organization of the Riverside Irrigation District sometime in 1906. To this end a contract or proposition was circulated among the residents of what afterward became that district. To this petition or proposition there was attached certain plans and specifications for the enlargement of the reservoir.

This petition was a proposition to purchase water

rights on the condition that the defendant company also make a contract with the proposed Riverside Irrigation District, for the enlargement of the reservoir. The contract was not to be binding upon the signers until at least 500 rights in the reservoir were contracted for, such water right contracts to be identical with those of the plaintiffs here. Further, that the defendant company should agree to sell to the proposed irrigation district 1,100 water rights in the reservoir, to be paid for in bonds of the proposed district.

That thereafter and on May 31st, 1907, the defendant concluded a contract with the irrigation district whereby the defendant was to sell 1,201 of the 2,400 agreed number of the water rights of the reservoir, to the irrigation district, in consideration of $717,500.00 of its bonds, the defendant agreeing to enlarge its reservoir accordingly, and in accord with certain plans and specifications thereto attached.

It is then said that the defendant performed this contract with the irrigation district, and that by virtue of the performance of said contract between the said company and said district, the defendant performed all the obligations assumed under the fifth clause of the contract with the plaintiffs.

The contract between the defendant and the district was accepted and approved by the irrigation district in January, 1909. It also appears that the defendant and the district accepted the measurements of an engineer agreed on, showing the reservoir to have a capacity of 2,505 million cubic feet.

It is urged that some of the plaintiffs signed the said subscription contracts, and that the same or others attended certain meetings of water right holders, when the question of acceptance of the contract by the district was under consideration, and that therefore the plaintiffs are bound by the action of the district.

It is also said that the president of the plaintiff, The Green City Irrigation District, in his individual capacity,

was employed by the defendant at a fee of $2,500.00 to assist in the promotion and organization of the Riverside Irrigation District, and that he was advised of, and assisted in drafting the plans for the enlargement of the reservoir.

Just how all this can estop the plaintiffs from asserting their rights under the plain provisions of their water right contracts is difficult of comprehension.

The contention of the defendant in this respect is stated in its reply brief to be:

"We do not now claim nor have we ever claimed that the signing of either Ex. 13 or Ex. 29 (subscription agreements) constituted the district the agent of the respective signers and the company that the reservoir was to be completed in accordance with a contract made or to be made with the district, and that upon completion of said reservoir in accordance with said contract the company fulfilled the obligations it assumed towards the respective purchasers of water rights under said subscription contracts. We further contend that those who purchased water rights, knowing that the reservoir was to be enlarged in accordance with a contract agreed upon or to be agreed upon by the company and the district, were bound by the plans and specifications contained in that contract and could not exact of the company anything in addition to the requirements embodied in said contract. This is not on the theory, however, that the district was agent of the respective purchasers of water rights, but is on the theory that said purchasers of water rights made said plans and specifications or said contract with the district their contract."

Clearly there is no express provision in the subscription agreement, to the effect that if the reservoir should be completed in accordance with the plans and specifications attached, that the defendant should then be held to have complied with its prior executed water right contracts. Nor is there any express waiver of any of the provisions of such water right contracts.

On the contrary it was provided that the water right contracts, so to be executed under the subscription agreement, were to be in the precise form of the contracts under which the plaintiffs claim. Neither was there any express provision in the subscription agreement that the subscribers should be bound by an acceptance of the construction by the defendant, or the irrigation district so to be organized. And it would seem absurd to assume that those plaintiffs who so agreed to purchase water rights under the subscription agreement intended to waive or release any of the obligations of the defendant, contained in the water right contracts then executed, or which they were to execute in the precise form and language of the former contracts.

But the evidence is overwhelming that the reservoir was not constructed or completed in accordance with the plans and specifications submitted with the subscription agreement, and the court was fully justified in so finding.

The statute controlled in the case of the enlargement, as well as in the original construction and the law was entirely ignored. The plans and specifications for such enlargement were not approved by the state engineer; the enlargement was not constructed under his control, or with his approval, and the construction was not approved nor accepted by him.

It appears also that at the time the defendant attempted to issue the stock to plaintiffs, there was indebtedness and encumbrance growing out of the construction and repairs, in a large sum of money, which was likewise in plain violation of plaintiffs water contract.

The plaintiffs in this case contracted for water rights in the reservoir, each one of which rights was to be of the capacity of one million cubic feet. There was not only a failure to substantially comply with this agreement, but the defendant has failed to furnish a respectable proportion of the capacity agreed, and has utterly ignored the law controlling in the construction of such reservoirs.

The obligation of contracts may not be impaired and the rights of persons destroyed by any such flimsy excuses as are sought to be interposed in this case.

The defendant does not claim to have tendered the stock until August 20th, 1910, and the court rightly held that it had not, up to that date, complied with its agreement.

The judgment of the court in dismissing the cross complaint, and in granting the injunction, is affirmed.

GABBERT, C. J., and GARRIGUES, J., concur.