**COLOWYO COAL COMPANY,**
Plaintiff–Appellee,

v.

**CITY OF COLORADO SPRINGS,**
Defendant–Appellant.

No. 92CA2077.

Colorado Court of Appeals,
Div. III.

Feb. 24, 1994.

Rehearing Denied April 7, 1994.

Certiorari Denied Sept. 12, 1994.

Davis, Graham & Stubbs, Andrew M. Low, Christopher L. Richardson, Robert A. Gatter, Jr., Denver, for plaintiff-appellee.

Collins & McConnell, Jeffrey C. Collins, Robert M. McConnell, Colorado Springs, James G. Colvin II, City Atty., Gregory L. Johnson, Asst. City Atty., Patricia K. Kelly, Sr. Litigation Atty., Colorado Springs, for defendant-appellant.

Alison Maynard, Craig, for amicus curiae City of Craig.

Opinion by Judge DAVIDSON.

Defendant, City of Colorado Springs, appeals from the declaratory judgment entered by the trial court in favor of plaintiff, Colowyo Coal Co. (Colowyo), and which determined that the long-term coal supply contract between the parties is valid, binding, and enforceable. We affirm.

In 1976, the parties entered into a long-term agreement under which Colowyo was to supply coal to Colorado Springs for use in its electrical power generation plants. Colowyo was attempting at that time to arrange long-term coal supply contracts in order to secure the financing necessary to open operations at a coal mine near Craig, Colorado. At the same time, Colorado Springs was expanding its coal generated electrical power capacity and, as coal prices were expected to rise dramatically in the coming years, was interested in acquiring an assured coal supply at a fixed price.

This long-term contract was approved by resolution of the Colorado Springs city council. Because the price of coal did not rise as

originally predicted, the agreed upon pricing system included in the contract—which to a large extent functioned independently of the prevailing market price for coal—soon led to a contract price which was substantially above the market price.

In 1982, and again in 1987, when the contract was revised, Colowyo agreed to lower the contract price. In 1991, the parties again attempted to negotiate a modification of the price. When the negotiations were unsuccessful, Colorado Springs appropriated an amount for the contract coal purchases in its 1992 budget which did not meet the terms of the contract. Colorado Springs then offered to pay this lower amount for the coal due to be delivered under the contract and refused to pay the higher contract price.

Colowyo filed suit in January 1992 for declaratory judgment as to the validity of the contract and for breach of contract and damages resulting from Colorado Springs' refusal to pay full contract price. Without waiving its rights to enforce the contract as written, Colowyo agreed to supply coal to Colorado Springs under the budgeted price. Colorado Springs filed a counterclaim for declaratory judgment claiming that the contract was unenforceable because of a prior appropriation provision in the Colorado Springs city charter.

Pursuant to a stipulated statement of facts, both parties moved for summary judgment on the declaratory judgment claim and counterclaim. After oral argument, the trial court entered judgment in favor of Colowyo and against Colorado Springs. The trial court found that the contract was a valid, binding, and enforceable agreement between the parties because a fund, separate and apart from the general city revenues, had been used to pay for the coal under the contract and this removed the contract from the effect of the city charter provision. Additionally, the trial court determined that running a utility is a proprietary activity to which the city charter provision did not apply. The trial court further found that Colorado Springs was estopped from disavowing the contract by representations made in the contract and by its behavior in abiding by the contract for a number of years. Pursuant to

C.R.C.P. 54(b), the trial court certified the judgment as final for purposes of appeal.

## I.

The fundamental question raised in this appeal is whether Colorado Springs, by the authority of Colorado Springs City Charter § 40 and through the exercise of its police power, can nullify, without liability, a long-term contract which it agrees was otherwise valid and which has been performed for 15 years. We hold that it cannot.

As a preliminary matter, in order properly to frame the issues, it is necessary to set forth the development of the city's arguments in these proceedings.

Section 40 of the Colorado Springs City Charter (previously § 44 at the time the contract was entered into) provides for a limitation on the ability of the city to incur contractual liability, with specific exceptions for emergencies, bonded indebtedness, and special assessments for local improvements. According to § 40:

*No Liability Without Appropriation*—Neither the Council nor any administrative officer or employee of the City shall have authority to make any contract involving the expenditure of public money, or impose upon the City any liability to pay money, unless and until a definite amount of money shall have been appropriated for the liquidation of all pecuniary liability of the City under such contract or in consequence thereof to mature during the period covered by the appropriation. Such contract shall be *ab initio* null and void as to the City for any other or further liability, provided, first that nothing herein contained shall prevent the Council from providing for payment of any expense, the necessity of which is caused by any casualty, accident or unforeseen contingency arising after the passage of the annual appropriation ordinance; and, second, that the provisions of this Section shall not apply to or limit the authority conferred in relation to bonded indebtedness, nor for monies to be collected by special assessments for local improvements.

Pursuant to this section, purchases and expenditures made by the city must be funded by monies which have already been appropriated by the city council.

In the trial court proceedings, Colorado Springs first took the position that § 40 created a means for the city to protect its ratepayers from runaway utility costs by requiring yearly appropriations of the funds necessary to pay for the scheduled deliveries of coal for that year. At the beginning of any fiscal year, Colorado Springs argued, if the city determined that the prices called for by the contract were too high, the city could, by simply failing to appropriate the necessary funds, declare the contract void as of that time and avoid "any other or further liability." In effect, Colorado Springs contended that § 40 engrafted an option upon the contract allowing it to renew yearly, and because Colowyo was aware, or should have been aware, that all relevant portions of the city charter applied to the formation of the contract, Colowyo should have realized the contract was subject to annual renewal.

Later, Colorado Springs argued, in the alternative, that the city's failure to appropriate funding for the entire 23–year term of the contract in 1976 rendered the contract *ab initio* null and void and that the delivery of coal and acceptance of payment by the city for 15 years was undertaken by Colowyo on a "volunteer" basis.

During oral argument on appeal, the city clarified its position and stated that it no longer wished to maintain that the contract was void *ab initio*. The city's reason for discarding its previous argument is not apparent. We note, however, that Colorado Springs behaved as if the contract were binding and enforceable for a significant portion of its intended length, including years in which the contract price significantly exceeded the market price. Because a party may not both affirm and disaffirm an agreement, if the city were now to assert that the contract was void *ab initio*, a reasonable inference could be drawn that, despite knowing of the invalidity of the contract, Colorado Springs affirmatively misled Colowyo as to that fact. *See Tayyara v. Stetson*, 30 Colo. App. 250, 492 P.2d 73 (1971).

As Colorado Springs now contends that the contract's validity from year to year was dependent upon annual appropriations by the city council, we will conduct our analysis accordingly.

## II.

Colorado Springs argues that the trial court's finding that § 40 did not operate to allow the city to nullify its long-term contract with Colowyo was in error. Specifically, Colorado Springs contends that the trial court erroneously determined that, in operating its utilities, Colorado Springs was acting in its business, or proprietary function, rather than its governmental function. We agree with the trial court that, pursuant to this distinction, the contract is valid and represents a binding agreement throughout its expressly stated term.

### A.

Colorado courts have recognized in several contexts the distinction between the actions of a city in its governmental, or legislative capacity, in which it is a sovereign and governs its citizens, and the actions of a city in its proprietary capacity, in which it acts for the private advantage of its residents and for itself as a legal entity. *City of Denver v. Hubbard,* 17 Colo.App. 346, 68 P. 993 (1902); *see also* 2 E. McQuillin, *Municipal Corporations* § 10.05 at 988 (3d rev. ed. 1988) ("Private, municipal, proprietary functions and powers are those relating to the accomplishment of private corporate purposes in which the public is only indirectly concerned, and as to which the municipal corporation is regarded as a legal individual. Private functions are those granted for the specific benefit and advantage of the urban community embraced within the corporate boundaries.").

"The governmental functions of a municipal corporation are those functions exercised ... for the public good generally, whereas proprietary functions are those exercised for the peculiar benefit and advantage of the citizens of the municipality." *City of Pueblo v. Weed,* 39 Colo.App. 415, 418–19, 570 P.2d 15, 18 (1977), *rev'd on other grounds,* 197 Colo. 52, 591 P.2d 80 (1979); *see also Nation-*

al Food Stores, Inc. v. North Washington Street Water & Sanitation District, 163 Colo. 178, 429 P.2d 283 (1967); cf. International Ass'n of Firefighters Local 1596 v. City of Lawrence, 14 Kan.App.2d 788, 798 P.2d 960 (1990) (the negotiation of an employment contract with a firefighters' union is an exercise of a municipality's proprietary power, not its governmental or legislative power) but see Keeling v. City of Grand Junction, 689 P.2d 679 (Colo.App.1984) (the setting of salaries for city police and fire department employees is a legislative function).

Historically, the governmental/proprietary distinction was of considerable importance in determining municipal liability for negligence. See 18 E. McQuillin, Municipal Corporations § 53.23 (3d rev. ed. 1993). In Colorado, the distinction is no longer critical in tort liability because of the adoption of the Governmental Immunity Act, which attempts to set out precisely under what circumstances a governmental entity has waived its immunity from actions in tort. See § 24–10–102, C.R.S. (1988 Repl.Vol. 10A) (in tort actions, "the distinction for liability purposes between governmental and proprietary functions should be abolished").

The distinction has remained important, however, in other contexts, including determining when officers of a municipality may perform acts which carry over beyond their terms of office. See J. Banks, Colorado Law of Cities & Counties 34 (3d ed. 1979).

Despite judicial criticism of the distinction, Colorado case law specifically recognizes that operation of a utility system is a proprietary, or "quasi-private" function. City of Northglenn v. City of Thornton, 193 Colo. 536, 569 P.2d 319 (1977).

Here, Colorado Springs was arranging for a supply of coal necessary to the operation of its electric utility. This is a proprietary function.

When providing utility services a city should have the ability to negotiate agreements which lie outside the scope of its legislative functions, including the ability to agree to furnish excess power or water to persons not living within the city boundaries. City of

Englewood v. City & County of Denver, 123 Colo. 290, 229 P.2d 667 (1951).

This capability of a municipality to act in a business capacity necessarily includes the ability to enter into long-term contracts with suppliers, who, if they had to trust the varying moods of city councils for compensation under the contract, might not risk the expenditures necessary to construct and maintain the requisite facilities. Leadville Illuminating Gas Co. v. City of Leadville, 9 Colo.App. 400, 49 P. 268 (1897). Also, when a city undertakes to provide utility services, it must have the same ability as a natural person to enter long-term contracts so that, under the practical realities of business, it can be certain that suppliers will be willing to deal with it and therefore ensure the continued provision of the utility services. City of Denver v. Hubbard, supra; see also Sedalia Land Co. v. Robinson Brick & Tile Co., 28 Colo.App. 550, 475 P.2d 351 (1970) (courts will not relieve contracting parties of an improvident bargain).

Here, the city acknowledges that it was able to interest Colowyo in a long-term contract because Colowyo needed the assured income in order to finance operations of its new mine.

1.

The city contends, however, that the governmental function/proprietary function distinction is no longer a viable doctrine in Colorado. Colorado Springs maintains that the governmental/proprietary distinction had been questioned at the time the contract was entered into in 1976, and citing City & County of Denver v. Mountain States Telephone & Telegraph Co., 754 P.2d 1172 (Colo.1988), argues that the distinction has now been firmly abolished except as limited to the provision of utility services outside of municipal boundaries.

■ Although we agree that the distinction has since been criticized as imprecise and analytically unsound in certain contexts, at the time the contract was entered into the distinction was observed. See Clark v. Town of Estes Park, 686 P.2d 777 (Colo.1984) (fn 2). The law at the time the contract was entered

into governs a contract with a municipality, see *Keeling v. City of Grand Junction, supra; see also Riverside Reservoir & Land Co. v. Green City Irrigation District,* 59 Colo. 514, 151 P. 443 (1915), and therefore, we must apply the distinction as it was applied in 1976.

### 2.

■ Colorado Springs asserts for the first time in its reply brief to this court that the 1987 restatement and revisions created an entirely new contract; therefore, it argues that the law regarding the governmental/proprietary distinction as it existed in 1987 should apply.

■ Ordinarily, an issue raised for the first time in an appellant's reply brief will not be considered. *See People v. Czemerynski,* 786 P.2d 1100 (Colo.1990). Because of the developments in the doctrine of governmental/proprietary distinction which have occurred through judicial interpretation throughout the last fifteen years, however, it is necessary to establish the operative date of the contract.

■ The consensus of both parties is required in order to modify or to supplant a valid contract. *Grizzly Bar, Inc. v. Hartman,* 169 Colo. 178, 454 P.2d 788 (1969). Here, neither party contests that the 1987 modifications were made by mutual consent.

Although the trial court did not address this specific question in any great detail, it referred to the 1987 document as the revised and restated agreement. Colorado Springs, however, maintains that the 1987 agreement substituted for the 1976 agreement and thereby rescinded the earlier agreement. In essence, it argues that the 1987 agreement was in the nature of a novation. We disagree, as the plain language of the 1987 restatement does not support a conclusion that it was a substituted agreement.

■ When the evidence of an agreement consists of documents, as here, the determination of their effect is a matter of law. *Radiology Professional Corp. v. Trinidad Area Health Ass'n, Inc.,* 195 Colo. 253, 577 P.2d 748 (1978). If no ambiguity exists, the intent of the parties is determinable from the terms of the written document. *See McNichols v. City & County of Denver,* 120 Colo. 380, 209 P.2d 910 (1949).

The 1987 document states, in pertinent part:

WHEREAS, the parties wish to further amend the Coal Sales Agreement and, as so amended, to restate the Coal Sales Agreement in its entirety.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree to amend and to restate the Coal Sales Agreement in its entirety as follows:

The agreement then proceeds to amend the terms of the 1976 agreement, including a reduction in price and an increase in the length of the contract. Nothing in the plain language of the document indicates an intention to substitute the 1987 agreement for the original contract.

■ In order to accomplish the substitution of a new contract for an existing contract, the pre-existing obligation must be extinguished; mere modification of certain contract terms does not suffice. *See Lampley v. Celebrity Homes, Inc.,* 42 Colo.App. 359, 594 P.2d 605 (1979); cf. *Richardson Drug Co. v. Dunagan,* 8 Colo.App. 308, 46 P.227 (1896) (before an agreement to substitute parties to a debt will substitute for the original contract, there must be an absolute extinguishment of the original debt and a mutual agreement to the substitution).

Because the 1987 agreement evidences merely mutual assent to a modification of terms, and not assent to complete extinguishment and substitution, the operative date for purposes of determining applicable law is the date the 1976 agreement was entered into. Therefore, the law as it existed in 1976 is controlling. *See National Construction Co. v. Owens,* 24 Colo.App. 65, 131 P. 794 (1913).

### B.

Colorado Springs places great emphasis on the fact that a municipality does not lose its municipal character when carrying on the operation of a utility system. *See State Compensation Insurance Fund v. Alishio,*

125 Colo. 242, 250 P.2d 1015 (1952). Relying upon *City of Englewood v. Ripple & Howe, Inc.,* 150 Colo. 434, 374 P.2d 360 (1962), it argues that a party entering into business dealings with a municipality bears the risk that a contract may be invalid for lack of properly appropriated funds. While acknowledging that this case was overruled in part by *Normandy Estates Metropolitan Recreation District v. Normandy Estates Limited,* 191 Colo. 292, 553 P.2d 386 (1976), Colorado Springs maintains that *Normandy Estates* modifies the *Ripple & Howe* principle only to the extent that it provides for the return of any property transferred under an invalid contract.

■ Although Colorado Springs has correctly interpreted the holdings of these two cases, we do not find the city's reliance thereon persuasive. In neither case was the municipality acting in its proprietary capacity as a utility system operator. In that capacity, a city is to a great extent subject to the same rules of business dealing which apply to a private party. *See City of Golden v. Western Lumber & Pole Co.,* 60 Colo. 382, 154 P. 95 (1916). This includes largely the same rules of contract that apply to private corporations. *See County of Larimer v. City of Fort Collins,* 68 Colo. 364, 189 P. 929 (1920); *Castlewood Corp. v. City & County of Denver,* 41 Colo.App. 565, 594 P.2d 1062 (1978).

## C.

■ Colorado Springs further argues that, even assuming the applicability of the governmental/proprietary distinction, it is charged with the duty of setting rates for its utility users, as well as with the duty of operating the utility; therefore, it concludes that it was acting in its governmental capacity when it failed to perform under the contract. We disagree.

The regulation of utilities, including the regulation of rates, is a governmental function. *See Colorado–Ute Electric Ass'n v. Public Utilities Commission,* 760 P.2d 627 (Colo.1988).

Colorado Springs, in its operation of a utility system, is free of the jurisdiction of the Colorado Public Utilities Commission in the provision of service within its municipal borders, as is any municipality which operates a utility system. Therefore, Colorado Springs is solely responsible for the rate setting functions for the utility. *See Board of County Commissioners v. Denver Board of Water Commissioners,* 718 P.2d 235 (Colo. 1986); *City of Englewood v. City & County of Denver, supra.*

This rate setting function, however, does not render the actual operation of the utility, including contracting with suppliers, a governmental function. "The municipal power to engage in private or proprietary activities is to be distinguished from the power to regulate or control such activities." 2 E. McQuillin, *Municipal Corporations* § 10.22 at 1061 (3d rev. ed. 1988); *see State ex rel. Kansas City Public Service Co. v. Latshaw,* 325 Mo. 909, 30 S.W.2d 105 (1930).

■ The determination whether a municipality is acting in its governmental or in its proprietary capacity depends upon the nature of the acts taken by municipal actors. 18 E. McQuillin, *Municipal Corporations* § 53.29 at 338 (3d rev. ed. 1993). Notwithstanding the fact that a city also performs some legislative functions concerning a municipal facility, the proprietary nature of the specific acts will be determinative. *See Rhodes v. City of Palo Alto,* 100 Cal.App.2d 336, 223 P.2d 639 (1950); *cf. City of Macon v. Powell,* 133 Ga.App. 907, 213 S.E.2d 63 (1975) (although the city airport was a proprietary function in some respects, the driver of the airport security department vehicle was acting in a governmental capacity).

Here, the parties were engaged in contracting for a long term supply of coal. This act was proprietary because it dealt with the operation of the utility and not with the setting of rates.

## III.

Colorado Springs also contends that the proprietary nature of its activities has no effect on the validity of the contract because the city council in 1976 was prohibited from obligating future city councils to appropriate the necessary funds. Accordingly, it argues, once the city chose not to appropriate the

necessary funds, the contract was no longer in effect. We disagree.

■ When acting in a proprietary capacity, a municipality may enter into a contract requiring payment for a term of years, and this does not impermissibly surrender legislative power by binding future city councils to the contract terms. *See Perl–Mack Enterprises Co. v. City & County of Denver,* 194 Colo. 4, 568 P.2d 468 (1977) (Contracts made within the proper scope of a municipal corporation's proprietary power, which bind the city for a number of years, are not objectionable as a surrender of legislative or police powers, since those powers are not involved); *National Food Stores, Inc. v. North Washington Street Water & Sanitation District, supra; City of Denver v. Hubbard, supra.*

### IV.

■ Colorado Springs also contends that regardless of the nature of the capacity in which it entered into the contract, § 40 is included in every contract with the city. We disagree, as there is no evidence that § 40 was expressly included within the terms of this contract.

### A.

The city urges us to find that § 40 is a part of any contract the city enters into and, by its effect, establishes an annual right or option of renewal exercisable at the discretion of the city. We do not agree because the express terms of the contract are absolutely to the contrary.

Paragraph 12.5 of the contract reads as follows:

*Construction.* No understandings, agreements or trade customs not expressly stated herein shall be binding on the parties in the construction or fulfillment hereof unless such understandings, agreements or trade customs are reduced to writing and signed by the respective parties. This agreement shall be construed in accordance with the laws of the State of Colorado.

Paragraph 13.1 of the contract reads as follows:

Seller and Buyer respectively warrant and represent (i) that the execution and delivery of this agreement has been duly authorized; and (ii) that all requisite actions, on the part of Seller and all other steps necessary, on the part of Buyer, to be taken to make this agreement and all the terms hereof a valid and binding obligation of Seller and Buyer respectively have been duly taken.

As the trial court noted, these two provisions of the contract, taken together, indicate, *inter alia,* that the contract is valid under all applicable provisions of the city charter. Therefore, the record plainly reveals that § 40 was not expressly included within the contract terms.

In addition, paragraph 2.1 of the contract provided that: "The term of this agreement shall be twenty-three (23) years ... subject to extension as provided in paragraph 2.4(b) or earlier termination as hereinafter provided in paragraph 12.8." Paragraph 12.8 gave Colorado Springs the option to terminate if Colowyo did not, despite best efforts, obtain all necessary authorization to open its coal mine near Craig. Colowyo had a reciprocal right to terminate if Colorado Springs did not obtain all necessary authorization to construct its new coal fired electric generation plant. No other provisions for early termination were included in the contract.

■ An agreement must be construed as a whole and so as to give effect to each of its provisions. *Public Utilities Commission v. City of Durango,* 171 Colo. 553, 469 P.2d 131 (1970). Also, the meaning of a contract should be determined from the entire instrument, not from isolated portions. *International Technical Instruments, Inc. v. Engineering Measurements Co.,* 678 P.2d 558 (Colo.App.1983). And, if the meaning of a contract may be determined by the written instrument, parties are bound by what it says, rather than by what the parties may say. *See Gardner v. City of Englewood,* 131 Colo. 210, 282 P.2d 1084 (1955).

As the trial court noted, the express terms of the contract itself, with the subsequent conduct of accepting and paying for coal for 15 years, evidences a binding long-term

agreement for the supply of coal. The trial court specifically rejected, as unsupported by the circumstances surrounding the contract negotiations, the suggestion that, in 1976, Colorado Springs entered into an agreement that it knew could be terminated at any time by the mere refusal to appropriate the funds called for under the contract.

By its express terms the agreement is a long-term, fixed-price contract. "The normal risk of a fixed-price contract is that the market price will change. If it rises, the buyer gains at the expense of the seller ... if it falls, as here, the seller gains at the expense of the buyer. The whole purpose of a fixed-price contract is to allocate risk in this way." *Northern Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265, 275 (7th Cir.1986).

Therefore, we conclude that, according to the written instruments, § 40 did not render the contract voidable at the discretion of Colorado Springs. Hence, the contract is valid as written. *See KN Energy, Inc. v. Great Western Sugar Co.*, 698 P.2d 769 (Colo. 1985).

### B.

Colorado Springs argues that, notwithstanding the express terms of the contract, Colowyo was on notice of the applicability of § 40 because the utilities attorney for the city explained in a 1987 letter that the contract was valid, subject to annual appropriations. We do not agree that this letter has any effect upon the validity of the contract.

■ If a contract is not ambiguous, extrinsic evidence is not admissible to modify its terms. *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371 (Colo.1990). Such is the case here. *See Reisig v. Resolution Trust Corp.*, 806 P.2d 397 (Colo.App.1991); *Niles v. Builders Service & Supply, Inc.*, 667 P.2d 770 (Colo.App.1983).

Moreover, as we have discussed, the operative date of the contract was the date it was signed in 1976. At that time, Colowyo was entitled to go to the negotiating table under the valid belief that it was dealing with a municipality in its proprietary capacity and

that, therefore, § 40 would not affect the negotiated terms of the contract.

Even if the date of the 1987 modifications were somehow significant, however, we note that the letter sent to Colowyo was dated more than a month after the effective date of the 1987 modifications. Hence, the trial court was correct in disregarding this extrinsic evidence which contradicted the terms of the contract. *See Magnetic Copy Services, Inc. v. Seismic Specialists, Inc.*, 805 P.2d 1161 (Colo.App.1990).

### C.

To the extent that Colorado Springs maintains that Colowyo was notified verbally in December of 1986 that § 40 applied to the contract, we agree with the trial court that this does not create a disputed issue of material fact. Even if so, all oral negotiations which took place prior to the 1987 modifications are immaterial because the parties reduced their agreement as to all modifications to a writing which contained no express reference to § 40. *See Ruskin v. Buehler*, 151 Colo. 577, 379 P.2d 809 (1963); *Blue Dolphin Investments, Ltd. v. Kane*, 687 P.2d 533 (Colo.App.1984); *see also Hoffman v. Wichita Farm Lighting*, 94 Colo. 153, 28 P.2d 808 (1934) (Evidence as to negotiations leading up to a written contract may not be admitted to vary its terms.).

### V.

■ Colorado Springs also argues that it had the unilateral right to abrogate the contract under its reserved police powers to protect its citizens, as ratepayers, from unreasonable utility expenses. We agree with Colowyo that, even if the city's police powers could be invoked to void an otherwise valid contract, Colorado Springs has not demonstrated the necessity to do so under the circumstances here.

■ Municipalities possess a broad and general police power to institute regulations for the public good, including those reasonably expected to protect the lives, health, and safety of their citizens. *See United States Disposal Systems, Inc. v. City of Northglenn*, 193 Colo. 277, 567 P.2d 365 (1977). Typical

municipal exertions of this police power include business and occupational licensing, nuisance abatement, traffic regulation, and the prevention of breaches of the peace. J. Banks, *Colorado Law of Cities & Counties* 101 (3d ed. 1979); *see also* § 31–15–401 C.R.S. (1986 Repl.Vol. 12B).

Generally, all contracts are entered into subject to this police power of the state, *Zelinger v. Public Service Co.*, 164 Colo. 424, 435 P.2d 412 (1967), and neither the state, nor a city, may contract away its police powers. *See Colorado Postal Telegraph Co. v. City of Colorado Springs*, 61 Colo. 560, 158 P. 816 (1916). However, regulatory or police powers are not involved in contracts, such as here, entered into by a city within its proprietary powers. *See Perl–Mack Enterprises Co. v. City & County of Denver, supra.*

Colorado Springs cites *Zelinger v. Public Service Co., supra*, for the proposition that a city may abrogate a contract pursuant solely to this inherent regulating authority. In that case, however, only the ability of a city to provide for utility rates by contract was at issue. The plaintiffs claimed to have a valid contractual right to lower utility rates by virtue of the franchise agreement under which Public Service Company provided utility services to the City and County of Denver. The court held that, when the City and County of Denver divested itself of the authority to regulate utility rates, this authority, as a regulatory police power of the state, was duly delegated to the Colorado Public Utilities Commission and took precedence over any claimed contract rates.

We are aware of no Colorado case, however, which holds that a municipality may invoke its police power to invalidate an otherwise valid contract between its own utility system and a supplier.

Moreover, even if we assume that police powers include the power to abrogate otherwise valid contracts, a city could do so only in limited circumstances when essential to protect the health, safety, or welfare of city residents. *See City of Colorado Springs v. Colorado City*, 42 Colo. 75, 94 P. 316 (1908).

Municipal police power is not infinite or unlimited; it will not extend beyond the reason for its exercise. Therefore, the public necessity which inspired invocation of the police power is the limit of its legitimate exercise. 6A E. McQuillin, *Municipal Corporations* § 24.09 at 30 (3d rev. ed. 1988).

Conceivably, crises could arise in which legitimate public necessity could justifiably require a municipality to invalidate a contract without incurring liability. No such urgent circumstances, however, have been demonstrated here.

The trial court found that the city charter required separate funds and accounts for the city utilities and for the funds of the other city departments. Colorado Springs City Charter § 79(a), as in effect in 1976, provided that: "The net earnings of the Department of Public Utilities shall be appropriated for the necessary requirements of any of its divisions, and any remaining surplus may be appropriated to the general revenues of the city, by the city council...." This provision was later repealed and re-enacted as Colorado Springs City Charter §§ 32(a) & (b), containing substantially the same language and specifically referring to a "Utilities Gross Income Fund," in which the funds are to be placed.

The mandatory nature of the language used demonstrates a deliberate decision to pay the necessary expenses of the utilities solely from net earnings. Testimony submitted from the deposition of the city utility comptroller supports this conclusion, as she indicated that the rates charged by the utilities were set so as to ensure that net earnings would be sufficient to pay expenses pursuant to a perceived legislative mandate to do so.

In addition, the city admitted that it was not facing a budgetary crisis relating to its coal supply and other utility expenses when it stipulated that it knew of no reason why it could not generate utility revenues sufficient to pay utility expenses and utility debt service throughout the life of the contract with Colowyo. Moreover, it was undisputed in the trial court that while Colorado Springs charges the third lowest rates in Colorado, its utilities were generating significant reve-

nue above what was needed to pay expenses and debt service and transferring the excess into the city's general fund.

Therefore, even assuming that under exigent circumstances a city can invoke its police power in this context, we conclude that the stipulated facts here reveal no basis upon which Colorado Springs can rely on an exercise of police power to abrogate this otherwise valid contract. *See Western Income Properties, Inc. v. City & County of Denver,* 174 Colo. 533, 485 P.2d 120 (1971).

## VI.

■ Finally, Colorado Springs argues that, according to *Department of Corrections v. Peña,* 855 P.2d 805 (Colo.1993), the contract is invalid because the city, as a legislative body, holds absolute power over appropriations and a court cannot order or implement relief in monetary damages to the extent that appropriations have not been made. We disagree.

The court in *Department of Corrections v. Peña, supra,* held that a court may enter judgment against the state as a governmental entity, even if, because of separation of powers concerns, it could not order the General Assembly to appropriate sufficient funds to satisfy that judgment.

The question of to what extent Colowyo may satisfy a judgment for monetary damages against Colorado Springs is not before us. The only question we are asked to determine here is whether the contract is valid and binding.

## VII.

Because of our resolution of the issues discussed, we need not address the parties' other contentions.

The judgment is affirmed.

CRISWELL and TAUBMAN, JJ., concur.