**CENTENNIAL–ASPEN II LIMITED PARTNERSHIP, Plaintiff,**

v.

**The CITY OF ASPEN and the City Council of the City of Aspen, the County of Pitkin, Colorado and the Board of County Commissioners of the County of Pitkin, Colorado, and the Aspen/Pitkin County Housing Authority and the Board of Directors of the Aspen/Pitkin County Housing Authority, Defendants.**

Civ. A. No. 92–B–2570.

United States District Court, D. Colorado.

May 20, 1994.

Norman D. Haglund, Edwin S. Kahn, Kelly, Haglund, Garnsey & Kahn, Denver, CO, for plaintiff.

John P. Worcester, Edward M. Caswall, City Attorney's Office, Aspen, CO, for Aspen City Counsel.

Timothy Whitsitt, Aspen, CO, for Pitkin County.

John M. Ely, Asst. Pitkin County Atty., Aspen, CO, for Pitkin County defendants.

Thomas Fenton Smith, Austin, Peirce & Smith, Aspen, CO, for the Housing Authority.

MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendants County of Pitkin and Board of County Commissioners of Pitkin County (collectively County) move for summary judgment on plaintiff Centennial–Aspen II Limited Partnership's (Centennial) claims for breach of contract, declaratory judgment, promissory estoppel, reformation or rescission of the contract, and attorney fees. Defendant Aspen/Pitkin County Housing Authority (Housing Authority) also moves for summary judgment. By orders dated April 22, 1993 and February 11, 1994, I granted the Housing Authority's motion to dismiss all of Centennial's contract and declaratory judgment based claims against it. As a result, promissory estoppel is the only claim remaining against the Housing Authority. The motions have been briefed fully and oral argument was held May 17, 1994. For all the reasons set forth below, I will deny the summary judgment motions.

## II.

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a

genuine factual issue to be tried. *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir.1980); Fed. R.Civ.P. 56(e). Summary judgment is appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence present in the motion and response. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–52, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986); *Mares,* 971 F.2d at 494.

### III.

Centennial owns fee title to a 148 unit apartment complex in Aspen, Colorado, called the Centennial Apartments (the Apartments). In August 1982, the Housing Authority's predecessor and the County requested proposals from development firms to construct and take title to an "affordable housing" complex initially called Silverking Phase IV. Following submission of the proposals, the County chose Centennial's predecessor as the developer. Contract negotiations began and culminated in the execution of a Disposition and Development Agreement (Development Agreement). Centennial's predecessor and the County are the only parties to this agreement.

The Development Agreement restricts the Apartment's rental increases to those allowed under certain local governmental "Qualification Guidelines" (Guidelines). However, if the Guidelines are not timely revised or amended, the percentage change in the urban index determines the rental increase amount. Section 3.02 of the Development Agreement provides:

a) The Developer agrees to comply with the Qualification Guidelines; however, upon amendment or replacement of Resolution No. 82–39 [the 1982 Qualification Guidelines] or if such resolution remains in force beyond 1982, the Developer shall be able to exceed the Qualification Guidelines in the following manner:

1) In any calendar year after the calendar year in which the Certificate of Completion is issued, the Developer shall be able to rent and sell Rental and Sale Units, respectively, so that the rent or sale price may be increased beyond the price ceilings in the Qualification Guidelines for the year in which such rental or sale takes place to the extent that the Aspen Wage Index for the calendar year of such rental or sale is greater that the Aspen Wage Index for the immediately preceding year.

In addition to annual adjustments in public housing rental rates, the Guidelines address the use, occupancy, price, and development of affordable housing. Specifically, they include: priorities for development; renting and purchasing qualifications; sale procedures; minimum size and quality standards; maximum sale prices for newly constructed units; maximum rents and sale prices for newly constructed units; occupancy standards; and grievance and show cause procedures.

On November 8, 1982, the City of Aspen (City), the Housing Authority of Aspen, the Board of County Commissioners of Pitkin County, and the Board of Commissioners of the Pitkin County Housing Authority executed an intergovernmental agreement (1982 IGA) to establish and jointly operate the Housing Authority. Pursuant to the 1982 IGA, the Housing Authority is authorized, among other things:

1. To plan for … a project to provide low, moderate, middle income housing on Phase IV Silverking land to replace Silverking units that will be condominiumized for the free market.

2. To annually adopt qualifications for ownership and rental [sic] low, moderate and middle income housing within the City and County as required by existing agreements and land use regulations.

*See* 1982 IGA, p. 2, ¶¶ 6 and 7. The project on the Silverking land is the Centennial project. The Centennial project is the only

housing project referenced expressly in the 1982 IGA. Subsequently, two additional IGAs were executed, one in 1984 (1984 IGA), and one in 1989 (1989 IGA). These IGAs changed the Housing Authority's responsibility regarding the Guidelines. Under the 1982 IGA, the Housing Authority adopted the Guidelines, but under the later versions, it recommends Guidelines. The 1984 and 1989 IGAs provide in article I.7 that the Housing Authority has:

> To annually recommend to the City and the County for approval, development of, and qualifications for, ownership and rental of low, moderate and middle income housing within the City and the County ... as required by existing agreements and land use regulations.

Notwithstanding this substantive change in the IGAs, the Housing Authority has never, since its inception in 1982, issued annual Guidelines without the County's and City's approval.

In 1984, before the Apartments were constructed, the County passed Resolution No. 84–32 (Rent Resolution) which altered the Development Agreement's mechanism for setting rental rates during the period at issue here. In relevant part, it provides:

> Beginning on January 1, 1990, and in each subsequent year, the monthly rental for each rental unit in the Project, whether designated low income or moderate-income, and whether occupied as of such date or not, may be increased over the gross monthly rental permitted in the prior year by the percentage increase in rent for existing rental units as contained in the Qualification Guidelines most recently published prior to January 1 of the year in which the rentals are to be increased, or if the Qualification Guidelines have not been revised or amended in the twelve month period immediately preceding January 1 of the year in which the rentals are to be increased, the percentage change in the Urban Index during the twelve months ending on November 30 of the year immediately proceeding the year in which the rentals are to be increased.

\* \* \* \* \* \*

The terms of this Resolution shall supersede any prior agreements or arrangements concerning rental rates in the Project.

Subsequently, the Development Agreement was amended three times. The first amendment left § 3.02(a)(1) of the Development Agreement intact; however, the second amendment deleted § 3.02(a)(1). In addition, § 2.01(c)(4) references the Rent Resolution as controlling over the Guidelines. *See* Third Amended Complaint, ¶ 36. The third amendment did not amend the Rent Resolution. Instead, consistent with the second amendment, it reaffirmed that Centennial's covenant to comply with the Guidelines meant the Guidelines as amended by the Rent Resolution. *Id.* at ¶ 39.

The 1984 Rent Resolution deferred the Guidelines' use as a rent-setting mechanism for five years. No dispute arose concerning the Guidelines' application until 1991. The Development Agreement is silent as to the specific method for establishing the Guidelines beginning January 1, 1990. At issue here is whether the Apartment's rental rate increases under the Guidelines and the amended Development Agreement must be based upon an objective measure of inflation.

### III.

■ Before addressing the merits of the summary judgment motions, I must determine the scope of admissible evidence. The question before me is whether evidence extrinsic to the amended Development Agreement is admissible to determine the parties' intent as to the Guidelines' application in setting the Apartments' annual rental rates after 1990. The Housing Authority and the County argue that the Development Agreement's and Rent Resolution's Guideline provisions are unambiguous and, thus, parol evidence is inadmissible. In response, Centennial argues that extrinsic evidence including parol evidence and "course of dealings" may be considered to supply consistent additional terms on which the amended Development Agreement is silent.

■ In this diversity action, this question turns on Colorado law. No one argues

otherwise. Whether ambiguity exists in a contract is a matter of law for the court to determine. *KN Energy, Inc. v. Great Western Sugar Co.*, 698 P.2d 769, 776 (Colo.1985), *cert. denied*, 472 U.S. 1022, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985). Ambiguity exists when "a contract provision is reasonably and fairly susceptible of more than one meaning." *Geralanes B.V. v. City of Greenwood Village*, 583 F.Supp. 830, 838 (D.Colo.1984) (citing *Union Rural Elec. Ass'n, Inc. v. Public Utilities Com'n of State*, 661 P.2d 247, 251 (Colo. 1983)). To ascertain whether contractual provisions are ambiguous, "the language used therein must be examined and construed in harmony with the plain and generally accepted meaning of the words employed and by reference to all the parts and provisions of the agreement and the nature of the transaction which forms its subject matter." *Cheyenne Mountain School Dist. No. 12 v. Thompson*, 861 P.2d 711, 715 (Colo.1993). In addition, I may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage and of the circumstances surrounding the making of the contract. *Kn Energy*, 698 P.2d at 777. However, the court may not consider the parties' own extrinsic expression of intent. *Id.* In determining whether a contract is ambiguous, the court may conditionally admit extrinsic evidence on this issue. *See Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 n. 3 (Colo.1984) (citing 4 S. Williston, A Treatise on the Law of Contracts § 601, at 311 (W. Jaeger ed. 1961)).

▌ Once a contract is determined to be ambiguous, its interpretation becomes an issue for the trier of fact to decide in the same manner as other disputed factual issues. *Cheyenne Mountain*, 861 P.2d at 715. Extrinsic evidence may then be admitted to assist in ascertaining the parties' intent. *Id.* One type of extrinsic evidence is parol evidence. It is admissible to explain or supplement the terms of an agreement, but not to vary or contradict them. *Id; See also Harmon v. Waugh*, 414 P.2d 119, 121 (Colo.1966) (The parol evidence rule does not operate to exclude oral agreements in explanation of a written instrument which patently does not contain all the terms and conditions of the contracting parties).

▌ The parties' prior course of dealings may also be considered in determining whether a contract is ambiguous. *Strategis Asset Valuation & Management, Inc. v. Pacific Mut. Life Ins. Co.*, 805 F.Supp. 1544, 1552 (D.Colo.1992); Restatement (Second) of Contracts § 223(2). "Course of dealings" is defined as "a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." *Id.* at § 223(1). Unless otherwise agreed, this evidence may be used to give meaning to, supplement, or qualify an agreement. *Id.* at § 223(2).

> Course of dealing may become part of an agreement either by explicit provision or by tacit recognition, or it may guide the court in supplying an omitted term. Like usage of trade, it may determine the meaning of language or it may annex an agreed but unstated term. There is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown, nor is it required that the course of dealing be consistent with the meaning the agreement would have apart from the course of dealing.

*Id.* at § 223(2), comment b. The parties' construction of the amended Development Agreement before the controversy arose can also be considered in construing an agreement. This conduct is a reliable test of their interpretation of the agreement. *Tucker v. Ellbogen*, 793 P.2d 592, 596 (Colo.App.1989), *cert. denied*, June 25, 1990.

▌ The Development Agreement and Rent Resolution are silent as to whether the Guidelines are adjusted annually by objective or discretionary criterion. Silence does not by itself necessarily create ambiguity as a matter of law. *Cheyenne Mountain*, 861 P.2d at 715. However, silence creates ambiguity when it involves a matter naturally within the scope of the contract. *Id.* Here, as in *Cheyenne Mountain*, the subject at issue, the methodology for annually adjusting the Guidelines, is naturally within the scope of the amended Development Agreement. Accordingly, I conclude that the parties' fail-

ure to specify this information in the Development Agreement, the Rent Resolution, or the Development Agreement's amendments, results in an ambiguity which is properly subject to clarification through evidence extrinsic to the agreement's four corners. *See Tripp v. Cotter Corp.,* 701 P.2d 124, 126 (Colo.App.1985) (lack of explanation of "cost of milling" gave rise to ambiguity justifying use of extrinsic evidence to explain and interpret term).

 The Housing Authority and the County further argue that the Development Agreement contains an integration clause and, thus, parol evidence offered to establish the existence of prior or contemporaneous agreements is inadmissable to vary the terms of the contract. *Keller v. A.O. Smith Harvestore Products, Inc.,* 819 P.2d 69, 72–73 (Colo.1991). Section 10.01 of the Development Agreement provides:

a) This Agreement, together with the attachments hereto, constitute the entire agreement of the parties with respect to the matters set forth herein. All prior discussions or understandings with regard to the subject matter hereof are deemed merged herein.

b) This agreement may be supplemented or amended only by a writing signed by the parties hereto.

This argument is without merit because Centennial seeks to introduce extrinsic evidence to explain the agreement, not to vary its terms. Furthermore, notwithstanding § 10.01, the amended Development Agreement is not a completely integrated agreement because it fails to set forth the parties' final expression as to methodology for annually adjusting the Guidelines' rental rates. *See* Restatement (Second) of Contracts § 209(1); *Harmon,* 414 P.2d at 121 (citing *Fleming Construction Co. v. Scott,* 348 P.2d 701 (Colo.1960)) (Where it is shown that a writing was not intended to be fully integrated, terms other than those set forth in the writing may be proved by parol evidence.) Because the amended Development Agreement is ambiguous and not integrated as to the method of setting of the annual rental rates under the Guidelines, parol evidence and the course of dealings between the parties is admissible to resolve this disputed material question of fact.

 I further conclude that the parol evidence rule and merger doctrine have no bearing on Centennial's alternative promissory estoppel claims against the County and the Housing Authority, or on its unilateral or mutual mistake based claims against the County. The parol evidence rule serves only to exclude evidence of prior or contemporaneous agreements designed to alter the terms of an unambiguous, completely integrated contract. *See Tripp,* 701 P.2d at 126. Since Centennial's promissory estoppel claims are not premised on the existence of a written contract, the parol evidence rule cannot exclude extrinsic evidence concerning these claims. The parol evidence rule is also inapplicable to claims based upon mistake in the formation of the contract. *Id.*

## IV.

 I turn next to the substance of the County's and the Housing Authority's summary judgment motion. Notwithstanding a clear dispute as to the existence of a contractual commitment or actionable promise to Centennial, the County and Housing Authority argue that any representations concerning the methodology for setting the Guidelines are not binding because setting guidelines is a legislative function which cannot be limited by contract as a matter of law. They further contend that Centennial was legally bound to know that the County, the Housing Authority or its representatives lacked the power to make such future commitments or representations. Thus, according to the County and Housing Authority, Centennial could not reasonably rely on any such representation.

 Defendants' legislative function argument raises the distinction between the County's action in its governmental capacity, in which it is sovereign and governs its citizens, and its actions in a proprietary capacity, in which it acts for the private advantage of its residents and for itself as a legal entity. This distinction has long been recognized as a viable doctrine in Colorado. *See Denver v. Hubbard,* 68 P. 993 (Colo.App.1902). In addition, its vitality was recently reaffirmed

and extensively discussed in *Colowyo Coal Company v. City of Colorado Springs*, 1994 WL 57860 (Colo.App. Feb. 24, 1994) (rejecting the City of Colorado Springs attempt to avoid its obligations under a contract for a long-term coal supply on the ground that this act was proprietary in that it dealt with the utility's operation, not with rate setting.)

■ Although the governmental/proprietary distinction in the tort area has been superseded by passage of the Colorado Governmental Immunity Act, the distinction retains its importance in non-tort areas. In particular, the distinction is relevant to determining whether governmental representatives may perform acts or make commitments which carry over beyond their terms of office. *Id.*, 1994 WL 57860 at *4.

■ Case law has established broad areas where the entity functions more as a business than government so as to be treated under the law as a private citizen concerning its proprietary acts. *Barnard v. Gaumer*, 361 P.2d 778, 781 (Colo.1961). For example, a governmental contract for lighting a city's streets for a term of years is not an improper surrender of the city's legislative powers, but is a proprietary activity to which future city councils are bound. *Hubbard*, 68 P. at 1000. Similarly, a governmental contract for the construction of, or operation of water, sewer, or other utility facilities is proprietary in nature. *See Board of Com'rs of Larimer County v. City of Ft. Collins*, 189 P. 929 (1920). There are numerous other examples in which Colorado governmental entities have been found to be acting in their proprietary capacity. *Williams v. City of Longmont*, 109 Colo. 567, 129 P.2d 110 (1942) (public parks); *City and County of Denver v. Publix Cab Co.*, 135 Colo. 132, 308 P.2d 1016 (1957) (airports); *City of Denver v. Davis*, 37 Colo. 370, 86 P. 1027 (1906) (refuse dumps); *Spomer v. City of Grand Junction*, 144 Colo. 207, 355 P.2d 960 (1960) (cemeteries).

Colorado's appellate courts have, however, found the governmental/proprietary distinction inappropriate in other instances. In *City and County of Denver v. Mountain States Tel. and Tel. Co.*, 754 P.2d 1172, 1176 (Colo.1988), the court concluded that the distinction has no validity in the context of utility relocation law. In *Clark v. Town of Estes Park*, 686 P.2d 777, 779 (Colo.1984), the court found the distinction unhelpful in deciding whether a municipality must abide by its own zoning ordinances. Neither of these decisions are applicable to the facts here.

■ Whether a municipality is acting in its governmental or proprietary capacity depends upon the nature of the acts taken by the municipal actors. *Id.*, 1994 WL 57860 at *6. To support their respective positions, the parties here define the action taken by the municipality differently. The County and Housing Authority contend that the action is the guideline-setting process itself. Centennial defines it as the development, construction, management and operation of public housing.

Centennial's argument is most persuasive. It contends that the governments' activities in this case are proprietary because their action provides local governmental entities with economic flexibility. For example, here, as in *Colowyo*, it enables them to enter into long-term contracts without those commitments being considered a surrender of legislative power of future officials. Absent such flexibility, it would be difficult, if not impossible, for municipalities and counties to interact with the private sector, particularly in circumstances where, as here, a private developer's cooperation was desirable, if not essential, to construct and manage the project.

This capability of a municipality to act in a business capacity necessarily includes the ability to enter into long-term contracts with suppliers, who, if they had to trust the varying moods of city councils for compensation under the contract, may not risk the expenditures necessary to construct and maintain the requisite facilities. (citation omitted). Also, when a city undertakes to provide utility services, it must have the same ability as a natural person to enter long-term contracts so that, under the practical realities of business, it can be certain that suppliers will be willing to deal with it and therefore ensure the continued

provision of utility services. (citation omitted).

*Colowyo Coal Company,* —— P.2d at ——, 1994 WL 57860 at *4.

In this case, the 1982 and 1984 IGA's specifically charged the Housing Authority with the duty to supervise the Silverking Phase IV project. The County contributed its own land to the project. In addition, Centennial submits evidence that it would not have entered into the amended Development Agreement without some assurance that rent restrictions would operate in a predictable and objective way in the future.

I conclude that the County was acting in a proprietary manner when it entered into the long-term contracts in this case. Accordingly, I cannot hold, as a matter of law, that setting the rental rates under the amended Development Agreement is a legislative, or for that matter, a quasi-legislative, activity such that the County is not bound to set annual rental rates as the parties intended when they executed the agreements. It follows, then, that the issue of intent is genuine, material and disputed.

Defendants' attempt to couch their Guideline setting process as legislative action fails for several reasons. First, the annual adjustment of the Guidelines is not a legislative function that has general applicability to the citizens of Aspen and Pitkin County. Instead, it constitutes a managerial tool by which the City, County, and Housing Authority manage and control various individual properties in which one or more have a proprietary interest.

■■■ Second, the County and Housing Authority may be liable for commitments or representations made during the negotiation process if the executed contracts concern a proprietary activity. In its proprietary capacity, a governmental entity is to a great extent subject to the same rules of business dealing and contract which apply to a private party. *Castlewood Corp. v. City & County of Denver,* 41 Colo.App. 565, 594 P.2d 1062 (1978).

Section 38–12–301, 16A C.R.S. (1982) further weakens the defendants' argument. It provides:

... the imposition of rent control on private residential housing units is a matter of statewide concern; therefore, no county or municipality may enact any ordinance or resolution which would control rents on private residential property. This section is not intended to impair the right of any state agency, county, or municipality to manage and control any property in which it has an interest through a housing authority or similar agency.

This statute distinguishes between broad-based "legislative" activities constituting "rent control", a function reserved to the state, and local governments' "proprietary" management of property in which they may have a property interest.

Finally, the County and Housing Authority contend that the setting of the Guidelines is a legislative function because they affect more than just Centennial. This argument is unpersuasive. Since 1982, the County and Housing Authority have expanded of Guidelines' application by entering into consensual contracts with private property owners in which they agreed to abide by the Guidelines' rental rate increases. In addition, the defendants have constructed public housing themselves which is also tied to the Guidelines. These consensual actions by the defendants are insufficient to transform an otherwise proprietary act, the setting of rental rate increases in the Guidelines, into a legislative one.

### V.

■■■ The last issue requiring resolution concerns Centennial's promissory estoppel claim against the Housing Authority. The elements of a promissory estoppel claim are: (1) the promisor made a promise to the promisee; (2) the promisor should reasonably have expected that the promise would induce action or forbearance by the promisee; (3) the promisee in fact reasonably relied on the promise and acted upon the promise to his detriment; and (4) the promise must be enforced to prevent to an injustice. *Vigoda,* 646 P.2d at 905. In addition to its "legislative function" argument, the Housing Authority argues that its employees lacked actual or apparent authority to promise how

the Guidelines would be established. Similarly, the County, relying on *Holland v. Board of County Commissioners*, 1994 WL 92161 (Colo.App. Mar. 24, 1994), argues for the first time in its reply that Centennial has produced no evidence of any action by the County's Board to bind them as to the manner of setting annual rent increases in the Guidelines through delegation, consent or ratification.

In light of my February 11, 1994 order, these arguments are without merit. I held that based on the 1982 IGA and § 29–4–209, 12A C.R.S. (1986), the promise of the Housing Authority's employee to Centennial which was allegedly made during the negotiations of the Development Agreement is not, as a matter of law, outside the scope of the agency relationship. The 1982 IGA authorized the Housing Authority to "negotiate contracts as required to accomplish management of the Housing" and to annually adopt Qualification Guidelines. In addition, the Housing Authority has "all powers necessary and convenient to carry out and effectuate the purposes and provisions of [the City Housing Law]". § 29–4–209, 12A C.R.S. (1986). That holding is equally applicable here where the Housing Authority seeks to avoid liability for a promise allegedly made by its own employee. Significantly, Centennial also presents evidence that the County's Board of Commissioners represented to Centennial's predecessor that the Guidelines' rental rate would be annually adjusted based on objective criteria.

 Next, the Housing Authority argues that promissory estoppel cannot be invoked in the presence of an express contract with the County concerning the same issue. In support, the Housing Authority relies on *Gilmore v. Ute City Mortg. Co.*, 660 F.Supp. 437, 439–40 (D.Colo.1986) for the proposition that promissory estoppel is inapplicable where there has been mutual agreement by the parties on all essential terms of a contract. This argument also lacks merit. Here, Centennial's contract claim against the Housing Authority was dismissed earlier because the Housing Authority was not a party to the amended Development Agreement. *See* Order dated April 22, 1993, p. 3. Thus,

as a matter of law, Centennial's promissory estoppel claim against the Housing Authority cannot be dismissed pursuant to the *Gilmore* holding. For these same reasons, the Housing Authority's next argument, that promissory estoppel cannot be based upon preliminary negotiations or an agreement to negotiate a contract, is also insufficient to support summary judgment in its favor. Moreover, as Centennial acknowledged at argument, its promissory estoppel claim is alternative to its contract claims.

 Finally, the Housing Authority argues that the alleged representations of its employee need not be enforced to prevent injustice. Because I cannot reach this conclusion as a matter of law at this juncture, summary judgment is inappropriate on this ground. Furthermore, Centennial responds with specific facts showing the existence of genuine factual issues to be tried. *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir.1980); Fed. R.Civ.P. 56(e). This includes, among other things, whether it was reasonable for Centennial to rely on the County's and Housing Authority's commitment or promise, the extent of its detrimental reliance, and the amount of damages, if any, necessary to prevent injustice. Accordingly, I will deny the Housing Authority's and the County's summary judgment motions as to the promissory estoppel claims.

Accordingly, IT IS ORDERED that:

(1) The Housing Authority's summary judgment motion IS DENIED;

(2) The County's summary judgment motion IS DENIED.