**PUBLIC SERVICE COMPANY OF COLORADO, a Colorado corporation, Petitioner-Appellant,**

**v.**

**The PUBLIC UTILITIES COMMISSION OF the STATE of COLORADO; Commissioners Edythe S. Miller, Daniel E. Muse and Clarence Raymond Clark, III; and Energenics Systems, Inc., Respondents-Appellees.**

**No. 83SA289.**

Supreme Court of Colorado, En Banc.

Sept. 4, 1984.

Kelly, Stansfield & O'Donnell, James R. McCotter, Denver, for petitioner-appellant.

L. Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard For-

man, Sol. Gen., Eugene C. Cavaliere, Deputy Atty. Gen., Denver, for Public Utilities Com'n.

Jeffrey G. Pearson, Denver, for Energenics Systems, Inc.

ROVIRA, Justice.

This is an appeal by Public Service Company of Colorado (PS Co) from a Denver District Court judgment which affirmed an order of the Public Utilities Commission (PUC) requiring PS Co to enter into a ten-year contract with Energenics Systems, Inc. (Energenics) for the purchase of electricity by PS Co from Energenics at certain rates. We affirm.

## I.

In 1978, the Congress enacted legislation in response to the nationwide energy crisis. As one means of achieving its goal of lessening dependence on imported oil, Congress decided to encourage the development of cogeneration and small power production facilities.[1] Public Utility Regulatory Policies Act of 1978, Pub.L. 95–617, 92 Stat. 3117 (1978) (PURPA). Section 210 of PURPA, 16 U.S.C. § 824a-3 (1982), was adopted to overcome what were perceived to be two obstacles to the development of nontraditional generating facilities: (1) reluctance on the part of electric utility companies to purchase power from and sell power to nontraditional facilities, and (2) avoidance by such facilities of the expense of regulation by state and federal utility authorities.

Section 210(a) of PURPA required the Federal Energy Regulatory Commission (FERC) to promulgate "such rules as it determines necessary to encourage cogeneration and small power production ... which rules require electric utilities to offer to—(1) sell electric energy to qualifying cogeneration facilities and qualifying small power production facilities and (2) purchase electric energy from such facilities." 16 U.S.C. § 824a-3(a) (1982).

Congress also provided in section 210(b) that the rules adopted by the FERC shall insure that the rates for purchased electric energy from a cogeneration facility or small power production facility,

"(1) shall be just and reasonable to the electric consumers of the electric utility and in the public interest, and

(2) shall not discriminate against qualifying cogenerators or qualifying small power producers.

No such rule ... shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy."

16 U.S.C. § 824a-3(b) (1982). Section 210(d) defines the term "incremental cost" of alternative electric energy "as the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." 16 U.S.C. § 824a-3(d) (1982).

Finally, section 210(f), 16 U.S.C. § 824a-3(f) (1982), provides that within one year after the FERC adopts its rules, state regulatory authorities shall implement the rules with respect to electric utilities for which they have rate-making authority.

In 1980, the FERC adopted rules regarding small power producers.[2] One of the rules required the states to set rates for purchases of power from small power producers at a level that equals the electric utilities full "avoided" cost. The "avoided" cost was defined as the incremental cost the utility would bear if it were required

---

1. A "cogeneration facility" is one that produces both electric energy and steam or some other form of useful energy, such as heat. 16 U.S.C. § 796(18)(A) (1982). A "small power production facility" is one that has a production capacity of no more than 80 megawatts and uses biomass, waste, or renewable sources (such as

wind, water, or solar energy) to produce electric power. 16 U.S.C. § 796(17)(A) (1982).

2. Hereafter in this opinion all references to small power producers will also apply, unless otherwise stated, to cogenerators.

itself to supply the electricity produced by the small power producer.[3]

In compliance with the congressional mandate, the PUC undertook in 1980 to implement the FERC's rules for Colorado electric utilities by initiating a rule-making proceeding, Case No. 5970, for small power producers. In September 1982, the PUC issued a decision which provided that electric utilities had to pay "their avoided costs of energy and capacity for purchases of such from qualifying facilities." *See* Rule 3.5021, PUC Rules, codified at 4 C.C.R. § 723–19 (1982).[4]

In 1981, Energenics began the process of obtaining water rights and state and federal permits for the purpose of constructing two small hydroelectric projects in Colorado. These projects, the St. Vrain facility and the Mt. Elbert facility, meet the criteria for qualifying small power production facilities set out in PURPA and the FERC rules. In the fall of 1981, discussions between Energenics and PS Co began concerning the purchase by PS Co of capacity and energy from Energenics' facilities. The negotiations were not fruitful, and in March 1982, Energenics filed a complaint with the PUC alleging, *inter alia*, that PS Co was in violation of PURPA and FERC rules. It asked the PUC to order PS Co to purchase the electric energy and capacity from its two facilities and to establish the rates for such purchases.

 PS Co denied any violation of PURPA and FERC rules. It asserted that it was willing to purchase capacity and energy from Energenics consistent with policies relating to purchases from small power producers being developed by it. At the hearing on Energenics' complaint, evidence was introduced by both parties relating to the appropriate capacity[5] and energy[6] payments which PS Co would be obligated to pay Energenics. The major dispute between the parties concerned the capacity payment, and it is to this issue that we now turn our attention.

Evidence concerning the appropriate capacity payment was presented by David Marcus, an engineering economist for Energenics, and William Martin, PS Co's Manager of Electric Planning and Analysis. The methodology employed by the witnesses conflicted and, as would be expected, their conclusions as to an appropriate capacity payment differed substantially.

Marcus' proposed capacity payments were grounded on his analysis of the marginal generation or power purchase costs of PS Co. In arriving at these costs, he considered the capacity charges PS Co committed itself to paying for firm purchased power from the Platte River Power Authority Rawhide Plant for the 1984–87 period. For the period 1988–90, Marcus based his capacity charge on the projected capacity costs of PS Co's planned Pawnee II facility, and for the period 1991–93, on PS Co's planned Cameo III generating units.[7]

Marcus and another Energenics witness, Granville Smith, also testified that their proposed rates were not only just and reasonable, but met the other standards set out in section 210 of PURPA; that is, they were in the public interest and were nondis-

---

**3.** 18 C.F.R. § 292.304(b) and (e) (1983). Certain of the FERC rules were successfully challenged by a number of public utilities in *American Electric Power Service Corp. v. Federal Energy Regulatory Commission*, 675 F.2d 1226 (D.C.Cir. 1982). However, the United States Supreme Court in *American Paper Institute, Inc. v. American Electric Power Service Corp.*, 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983), reversed, holding that the FERC had not acted arbitrarily or capriciously in promulgating the rules.

**4.** Case No. 5970, Decision No. 82–1438. This decision was appealed by several electric utilities. *See Highline Electric Association, Inc. v. Public Utilities Commission*, Adams County District Court, Civil Action No. 82 CV 2512, filed November 12, 1982. PS Co was a party in Case No. 5970 and is a party in the appeal proceeding.

**5.** "Capacity" relates to the amount of energy which a facility is capable of producing at any given time and is expressed in kilowatts (kw).

**6.** "Energy" relates to the amount of energy produced by the facility over time and is expressed in kilowatt hours (kwh).

**7.** Pawnee II and Cameo III were capacity additions projected by PS Co to come on line in 1988 and 1991.

criminatory. In support of these latter criteria, Smith testified that the rates proposed by Marcus would enable Energenics to finance the proposed facilities and thus add capacity and reliability in PS Co's peak summer season. This, in turn, would delay the time that PS Co would need to construct additional facilities. Marcus also testified that his proposed rates were non-discriminatory in the economic sense since Energenics would be receiving prices for its electrical energy equal to that paid to others by PS Co.

Martin, PS Co's only witness, testified that the 5,000 kilowatt capacity of Energenics' proposed facilities would not by itself have any impact on PS Co's need to build new power plants, but when combined with that of other small power producers would have an impact on its need to purchase firm power from others. Further, he testified that the opportunity to purchase energy from small power producers might, depending on price, allow PS Co to avoid operating some of its turbines or purchasing spot energy from other utilities.

Martin expressed the view that the price recommended by Energenics was so high that it would be cheaper for PS Co to rely on its own generation facilities or purchase energy from other utilities. Martin then proposed two payments, one for capacity and one for energy. His capacity payment was based on the weighted capacity costs incurred by PS Co in connection with its existing firm purchases and on the cost of its most recently installed power plant, Pawnee I, escalated to the year that Energenics' facility became operational. It was also his position that the capacity payment should be fixed for the term of the contract in recognition of the one time investment by Energenics and the resulting cost avoidance by PS Co.

In connection with the energy payment, Martin testified that it should be based upon a weighted average of Pawnee I energy costs and the energy component of firm purchases from other utilities. He believed that, unlike the capacity payment, the energy payment should escalate as PS Co's costs increased during the term of the contract.[8]

The PUC issued its decision on October 14, 1982. In its extensive findings, it recognized the differences in the theoretical and methodological approaches of the two key witnesses, Marcus and Martin. It noted that, even though its rules for small power production proposed in Case No. 5970 were final but not yet in effect because they had not been published, they contemplated that electric utilities should purchase power from small power producers at a rate not to exceed long run marginal costs for each utility. It then stated that the rules do not permit an electric utility to use a "costing methodology that averages in existing power plants already in service, which plants could not be built today for the same cost incurred five or ten years ago. Such a cost methodology would not encourage small power production or cogeneration."

The PUC determined that the capacity costs payable by PS Co to Energenics should be based on capacity purchased from the Rawhide plant for the period 1984–87, and incremental capacity costs for the period 1988–93 should be based on PS Co's next proposed marginal plant, Pawnee II. In arriving at the 1988–93 figure, it rejected as speculative Energenics' position that the incremental capacity costs for 1991–93 should be based on PS Co's proposed Cameo III plant. It also found that energy costs should be matched to capacity costs, Rawhide for the years 1984–87 and Pawnee II for the period 1988–93. Again it rejected Cameo III for the period 1991–93.

As a result of its findings, the PUC established energy and capacity costs for a ten-year period. The capacity costs ranged from 4¢/kwh in 1984 to 6.32¢/kwh in 1993.

8. The energy payment proposed by Energenics was based on the purchase or facility used to determine the capacity payment and, when added to the derived per kilowatt hour capacity payment, would yield a total per kilowatt hour payment. PS Co conceded in its brief that the principal difference between the parties relates only to the capacity payment.

Energy costs ranged from 1.9¢/kwh in 1984 to 4.17¢/kwh in 1993. PS Co petitioned in Denver District Court for judicial review of the PUC's order. The district court affirmed, and PS Co then appealed, claiming that the PUC had erred (1) in determining its "avoided costs"; (2) in refusing to permit it to include in its Electric Cost Adjustment the purchases by PS Co from Energenics; and (3) in refusing to order that the contract between PS Co and Energenics should include a provision restricting PS Co's obligation to purchase power during certain periods.

## II.

■ It is not necessary to reiterate here the standards and purposes of judicial review of PUC orders. *See Colorado Municipal League v. Public Utilities Commission,* 687 P.2d 416 (Colo.1984). Suffice it to say that findings of the PUC will not be set aside because the evidence is conflicting, or because conflicting inferences can be drawn from the evidence, but only if the record is insufficient to support them.

■ PS Co claims that the PUC should have based the capacity payment to Energenics solely on PS Co's avoided costs in 1984, the year the Energenics facilities are scheduled to go into service, and not increase that payment in 1988 by taking into account PS Co's avoided costs for the proposed Pawnee II plant. The rationale underlying PS Co's position is that different capacity costs do not become avoided over time. It contends that the cost of avoided capacity is set at the time it is avoided, and therefore Energenics' facilities will avoid capacity for PS Co only at one point in time. It claims that the increased capacity payment in 1988 will be unjust and unreasonable to its customers and require it to make payments in excess of its incremental cost of capacity. PS Co argues that the increased or "stairstep" capacity payment is inconsistent with PURPA and with FERC and PUC regulations.

Our analysis of section 210 of PURPA, the rules of the FERC, and the legislative intent behind the adoption of PURPA does not support PS Co's position. Section 210(d) of PURPA defines "incremental cost of alternative electric energy" as "the cost to the electric utility of the electric energy which, but for the purchase from such ... small power producer, such utility would generate or purchase from another source." While the legislative language does not require or forbid capacity costs to be determined at one fixed point in time, review of the legislative history of PURPA provides support for the PUC's conclusion that capacity costs of a utility are its ongoing marginal capacity costs which will vary over time.

House Conference Report No. 95–1750,[9] which reflects the views of the conferees from the House of Representatives and the Senate, states that section 210(b) of PURPA does not require a utility to purchase electric energy from a small power producer at a rate which exceeds the lesser of the rate which is just and reasonable to consumers of the utility, is in the public interest, and is nondiscriminatory, or the incremental cost of alternate electric energy. The report also states that, in interpreting "incremental cost of alternative energy" (Section 210(d) of PURPA),

> "the conferees expect that the Commission [FERC] and the states may look beyond the cost of alternative sources which are instantaneously available to the utility. Rather, the Commission and States should look to the reliability of that power to the utility and the cost savings to the utility which may result at some later date by reason of supply to the utility at that time of power from the cogenerator or small power producer...."

One of the FERC rules for the regulation of sales and purchases between small power producers and electric utilities provides:

**9.** H.R.Conf.Rep. No. 95–1750, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad. News 7797, 7832–33.

"In the case in which the rates for purchases are based upon estimates of avoided costs over the specific term of the contract ... the rates for such purchases do not violate this subpart if the rates for such purchases differ from avoided costs at the time of delivery."

18 C.F.R. § 292.304(b)(5) (1983).

Our review of PURPA and the rules enacted by the FERC in furtherance of PURPA's stated purpose leads us to conclude that the PUC had ample legal support for its conclusion that an increase in the capacity payment in 1988 was proper. The evidence before the PUC established that PS Co needed additional electric capacity over the ten-year period, 1984–93, and planned to build and have in service by 1988 its Pawnee II plant. In addition, the evidence supported the conclusion that PS Co would be a net purchaser of capacity from others throughout the decade of the eighties.

In connection with the purchase of power from other utilities, PS Co's own resource plan indicated that the capacity payments it would pay to the selling utilities would increase every two or three years. This increase resulted from the reluctance of the sellers of power to enter into long-term contracts.

Based on our review of the statutes, the rules, and the record in this case, we are satisfied that the findings of the PUC were based on sufficient evidence to establish that an increase in the capacity payment to Energenics in 1988 was warranted.

### III.

■ PS Co also contends that the PUC abused its discretion in not permitting it to include the costs of purchases from Energenics in the calculation of its electric cost adjustment (ECA). The ECA permits PS Co to adjust its rates, on a monthly basis, to reflect increases or decreases in its electric costs. The PUC, in denying PS Co's request, stated that the ECA was originally established for the limited purpose of allowing PS Co timely recovery of fuel costs which are a volatile and significant part of the total cost of supplying energy. It further found that the payments to Energenics did not exhibit the characteristics of those expenses properly includable in the ECA, that energy and capacity payments are not a significant part of the total energy and capacity mix of PS Co, and that the payments to Energenics should be recovered as part of PS Co's base rates which should be established in a general rate proceeding.

The ECA is similar to the gas cost adjustment (GCA) which we considered in *Public Service Co. v. Public Utilities Commission*, 644 P.2d 933 (Colo.1982). There, PS Co argued that the PUC had abused its discretion in not allowing payments to the Gas Research Institute to be passed on to customers through the GCA. In holding that the PUC had not abused its discretion or acted arbitrarily, we recognized that the payments to the Gas Research Institute were reasonably incurred operating expenses of PS Co, but that the decision to allow recovery of those expenses in a general rate proceeding or by means of the monthly GCA was a matter lying within the administrative discretion of the PUC.

Since the PUC stated in its order that the "energy and capacity payments to Energenics should be recovered as part of the Company's [PS Co's] base rates which should be established in a general rate proceeding, rather than through the ECA ...," we conclude that its decision falls within its administrative discretion.

### IV.

■ The last issue raised by PS Co is that the PUC erred in not ordering the inclusion, in the contract between PS Co and Energenics, of a provision limiting PS Co's obligation to purchase capacity and energy during certain periods.

On April 18, 1984, the PUC entered an order in Investigation and Suspension Docket 1603. In that order, C84–472, the PUC addressed the issue raised by PS Co concerning its obligation to purchase capac-

ity and energy during certain periods. Subsequently, by appropriate filing with this court, PS Co stated "that it has no objection with respect to [this] issue ... to a determination by the Court that the operating circumstances language found appropriate by the Commission in Decision No. C84–472 ... be deemed to be included in the agreement between Public Service Company and Energenics." In view of Decision No. C84–472 and PS Co's response, we are of the opinion that there is no appellate issue remaining for this court to resolve.

The judgment of the district court is affirmed.