**PHOENIX POWER PARTNERS, L.P., Plaintiff–Appellant,**

v.

**The COLORADO PUBLIC UTILITIES COMMISSION, Commissioner Christine E.M. Alvarez, Commissioner Vincent Majkowski, and the Public Service Company of Colorado, Defendants–Appellees.**

**No. 97SA65.**

Supreme Court of Colorado,
En Banc.

Feb. 2, 1998.

Jeffrey G. Pearson, Kelly/Haglund/Garnsey & Kahn, LLC, Denver, for Plaintiff–Appellant.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Linda L. Siderius, Deputy Attorney General, Richard Djokic, First Assistant Attorney General, Mana L. Jennings–Fader, Assistant Attorney General, Regulatory Law Section, Denver, for Defendants–Appellees The Colorado Public Utilities Commission, Commissioner Christine E.M. Alvarez, and Commissioner Vincent Majkowski.

LeBoeuf, Lamb, Greene & MacRae, L.L.P., Mark A. Davidson, Public Service Company of Colorado, William M. Dudley, Denver, for Defendant–Appellee The Public Service Company of Colorado.

Justice KOURLIS delivered the opinion of the Court.

Phoenix Power Partners, L.P. (Phoenix) appeals a judgment of the district court affirming Orders of the Colorado Public Utilities Commission (PUC). This court has direct appellate jurisdiction under section 40–6–115(5), 11 C.R.S. (1997). Phoenix challenges the PUC's ruling, as affirmed by the district court, that certain amendments to a contract between Phoenix and Public Service Company of Colorado (PSCo) were so substantial as to create a new contract not entitled to grandfathered benefits. Phoenix also contests the ruling that the new contract must be submitted to PSCo in accordance with established bidding procedures. We now conclude that the district court correctly determined that the amendments created a new contract, and that the new contract would have to comport with the bidding procedures. Accordingly, we affirm the judgment of the district court.

## I.

In 1988, Phoenix's predecessor in interest, Montrose Partners, Ltd.,[1] (Montrose/Phoenix) entered into a power purchase agreement with PSCo whereby Montrose/Phoenix agreed to sell energy and capacity[2] to PSCo from a hydro-electric plant it proposed to build in Montrose, Colorado. The Montrose facility was to be a qualifying small power production facility under the Public Utility Regulatory Policies Act of 1978 (PURPA). See Pub.L. No. 95–617, 92 Stat. 3117 (1978).

In order to place the facts of this case in context, we begin with a brief review of PURPA and its related regulations. Congress enacted PURPA in 1978, in response to a nationwide energy crisis. The purpose of PURPA was to reduce reliance on foreign oil, and on fossil fuels generally, by encouraging energy efficient cogeneration[3] technologies and by stimulating the development of renewable, non-traditional energy resources. See 16 U.S.C. §§ 796, 2601 (1994). PURPA directed the Federal Energy Regulatory Commission (FERC) to adopt rules necessary to encourage utilities to purchase power from qualifying cogeneration and small power production facilities.[4] See 16 U.S.C. § 824a–3(a)(1994). The rates for these purchases were to be just and reasonable to electricity consumers and were not to exceed the incremental cost to the utility of alternative electric energy. See 16 U.S.C. § 824a–3(b)(1994). PURPA also required that state regulatory authorities implement the FERC rules for electric utilities within their jurisdictions. See 16 U.S.C. § 824a–3(f)(1)(1994).

In 1980, FERC promulgated rules defining small power production facilities and cogeneration facilities. See 18 C.F.R. §§ 292.203 to 292.206 (1997). The term "qualifying facil-

ity" or "QF" is used herein to describe either of these two types of PURPA-qualified facilities. The FERC rules require electric utilities to purchase energy and capacity from qualifying facilities. See 18 C.F.R. § 292.303 (1997)("Each electric utility shall purchase ... any energy and capacity which is made available from a qualifying facility"). FERC adopted the "full avoided cost" approach to setting rates for purchases from qualifying facilities. Under this approach, the utility sets rates based upon the cost that the utility would have incurred in building its own power plant or purchasing a like amount of power from a non-qualifying facility. See 18 C.F.R. §§ 292.304(b)(2), 292.101(b)(6) (1997).

In 1982, the PUC adopted rules implementing the FERC rules. See Rules Implementing Sections 201 and 210, PURPA, Small Power Production and Cogeneration Facilities, 4 C.C.R. § 723–19 (adopted 1982 and as amended) (the Colorado QF Rules). The Colorado QF Rules parallel the FERC rules in requiring electric utilities to purchase power from QF's at rates based on the full avoided cost. See 4 C.C.R. § 723–19, Rules 1.207, 3.401. In order to facilitate financing of QF projects, the avoided cost rate calculated at the inception of the contract can be fixed or "locked in" for the full term of the contract.[5] See 18 C.F.R. 292.304(d)(2) (1997); 4 C.C.R. § 723–19, Rule 3.507.

Initially, PSCo set its QF avoided costs administratively and filed tariffs establishing capacity payments derived from these administratively determined avoided costs. Over the next few years, numerous QF developers approached PSCo seeking to sell electricity at the rates set by tariff. By 1987, PSCo reported to the PUC that continued mandatory QF purchases would result in excess

---

1. The 1988 contract was signed by the president of Mitex, Inc. on behalf of Mitex. Mitex, Inc. is the general partner of Montrose Partners, Ltd. Sithe Energies wholly owns both Mitex, Inc. and Phoenix Power Partners, L.P.

2. Capacity refers to the amount of energy that a facility is capable of producing at any one time. Energy is the amount of electricity actually produced by the facility over time. See Public Serv. Co. v. Public Utils. Comm'n, 687 P.2d 968, 971 n. 5, 6 (Colo.1984).

3. Cogeneration, in simple terms, refers to the process by which waste heat from a coal, oil, or natural gas-fired plant is captured and put to productive use.

4. Small power production facilities basically include facilities that use something other than coal, oil or natural gas as a primary fuel source.

5. This reduces the uncertainty and risk associated with a QF's revenue stream.

capacity in the system during the years 1991 through 1993. Payments for excess or unnecessary capacity would translate into higher rates for consumers. Consequently, PSCo sought approval for a moratorium on its obligation to purchase QF power.

In Decision No. C87–1690 (Dec. 16, 1987)(the Moratorium Decision), the PUC authorized a temporary moratorium on purchases from QF's, but exempted certain contracts from the moratorium by operation of a grandfather clause. The PUC specifically exempted from the moratorium the pending contract with Montrose/Phoenix and required PSCo to continue negotiating with Montrose/Phoenix in good faith. The PUC reserved the right to approve or disapprove any resulting contract on the basis of whether or not it contributed to the excess capacity and cost problems that prompted the moratorium. Shortly after the moratorium was granted, the PUC approved a biennial bidding process to establish avoided costs for future power purchases from QF's. *See In re Public Serv. Co. of Colo.*, 93 Pub. Util. Rep. 4th 384, 399 (June 9, 1988)(Dec. No.C88–726).

On April 6, 1988, Montrose/Phoenix and PSCo signed a fifteen-year contract under which PSCo would purchase approximately 48.5 Megawatts of capacity from a qualifying water-powered small power production facility to be built in Montrose (the 1988 Agreement). The 1988 Agreement was based upon the 1987 tariffs and was not subject to the new bidding procedure for setting avoided costs because of the grandfather provision in the Moratorium Decision. *See* Dec. No. C87–1690 (Dec. 16, 1987). Hence, the contract purchase rate was determined by PSCo's filed 1987 tariffs reflecting PSCo's administratively set avoided costs. Under the terms of the 1988 Agreement, power deliveries were to begin no earlier than April 1992. The PUC approved the contract on June 29, 1988 in its Decision Number C88–792.

Montrose/Phoenix began to encounter significant difficulties with the federal permitting process and, in November 1991, negotiated an amendment extending the earliest delivery date to September, 1994 (the 1991 Amendment). The 1991 Amendment also reduced the capacity from 48.5 to 43.5 megawatts. The PUC approved the 1991 Amendment at an open meeting in December of 1991.

Permitting difficulties associated with the Montrose site continued, and in 1992, Montrose/Phoenix and PSCo began to negotiate further amendments to the 1988 Agreement. In March of 1993, Phoenix[6] and PSCo entered into an agreement purporting to amend and restate the 1988 Agreement (the 1993 Amendment). The parties executed the 1993 Amendment in the form of a full contract, some 133 pages in length including exhibits, and restated their entire agreement including the changes.

The 1993 Amendment changed the location of the plant from Montrose to Greeley, and the method of power generation from a water-powered facility to a natural gas-fired cogeneration facility. The waste heat from the Greeley facility would have been used to heat and cool the University of Northern Colorado (UNC) campus. The 1993 Amendment also slightly changed the contemplated capacity. The maximum capacity output at the Montrose hydro-electric plant would have depended upon the varying flows of the Uncompahgre River. As a result, capacity would have averaged about 35 megawatts in summer and 43.5 megawatts in winter. The Greeley site offered a steady 43.5 megawatts of capacity throughout the year. This feature would have allowed PSCo to dispatch, or schedule, the output more dependably and was a benefit to PSCo over the Montrose site. The price also changed somewhat. The Greeley site, because of its greater dispatchability, commanded a higher rate under the 1987 tariffs than the Montrose site.[7]

---

**6.** Once the parties contemplated moving the facility from Montrose, Sithe Energies created the Phoenix entity as an ownership vehicle for the Greeley location. According to Phoenix's testimony before the PUC, the entity was changed only to avoid confusion that might result from using the name Montrose Partners for a Greeley facility.

**7.** The effective rate increase, however, was relatively small. Under the 1993 Amendment, Phoenix agreed to pay PSCo $1.4 million to cover

In accordance with the language of the agreement itself, and with PUC rules and decisions, PSCo submitted the 1993 Amendment to the PUC for approval. The staff of the PUC raised concerns about the 1993 Amendment, suggesting that the proposed changes were so significant and numerous as to create a new contract, not entitled to the grandfathered status granted to the 1988 Agreement. The staff report further noted that as a proposed new contract for QF power, Phoenix would have to compete for the right to sell its power in the bidding system established for QF's by Decision Number C88–726. The PUC set the matter for hearing before an Administrative Law Judge (ALJ) on October 14, 1993.

Both Phoenix and PSCo took the position at the hearing that the 1993 Amendment was, in fact, simply an amended version of the existing and approved 1988 Agreement. Therefore, under the grandfather provision of the Moratorium Order, they argued that the PUC's only function should be to determine whether the changes, compared to the original agreement, would benefit ratepayers. Phoenix and PSCo both presented evidence that the 1993 Amendment significantly improved the financial consequences of the original deal for PSCo and consequently for its ratepayers.

Moreover, Phoenix argued that the PUC's analysis of whether the 1993 Amendment fell within the scope of the grandfathered 1988 Agreement should be governed by the purpose and language of the Moratorium Order. The need for the moratorium arose out of excess capacity. The PUC exempted certain contracts from the impact of the moratorium, provided that they did not exacerbate the capacity problem. Phoenix asserted that the capacity offered under the 1988 Agreement was, in fact, needed by PSCo. Basically the same capacity was contemplated under the 1993 Amendment, although generated in a different manner and from a different location. Phoenix contended that because the changes would benefit the ratepayers, without contributing to the capacity problem, there was no basis for PUC rejection.

The practical impact of any decision as to whether the 1993 Amendment was grandfathered or created a new contract revolves around price. The price set in the 1987 tariffs for QF power is higher than the price for comparable power in 1993. If Phoenix were offering a new contract, the price would have to comport with 1993 standards and would need to follow the bidding procedure. If the 1993 Amendment related back to the grandfathered contract, PSCo had a legal obligation to pay the 1987 tariffed rates which were "locked in" under PURPA and Colorado QF Rules.

The ALJ, in his recommendations to the PUC, concluded that the 1993 Amendment created a new contract.[8] The PUC adopted the ALJ's ruling. The PUC found that the parties had altered the essential elements of the 1988 Agreement and created a new contract by changing the technology, location, fuel source, legal entities and capacity payment.

The district court affirmed the PUC's finding of a new contract. Like the PUC, the court considered the change in location, technology and legal entity to be dispositive. The court held that the PUC's ruling was just, reasonable and in accordance with the evidence. Phoenix now appeals the judgment of the district court directly to this

transmission upgrades for the new system. This payment would have been implemented in the form of reduced capacity payments. Accordingly, the resulting overall rate increase was from $16.22 to $17.59 per kilowatt hour.

8. The ALJ made several other findings of fact related to the proposed transaction. He found that, in the past, the PUC had only approved amendments to other QF contracts involving changes in effective dates, changes in location of a short distance, or reductions in capacity payments. He further noted that the PUC had generally approved only one amendment to previous QF contracts. The ALJ found that the grandfathered price was more costly than any firm power currently available in the Western System Coordinating Council region. Moreover, the ALJ found that PSCo had projected no shortage of capacity over the next several years, hence the proposed capacity would not be useful to PSCo and its ratepayers. The ALJ found that the contract offered no benefits to PSCo customers, and actually was detrimental from a rate standpoint.

court under the provisions of section 40–6–115(5).

## II.

■ Judicial review of a PUC order is governed by section 40–6–115, 11 C.R.S. (1997), which provides in pertinent part that decisions may be reviewed "to determine whether the commission has regularly pursued its authority ... and whether the decision of the commission is just and reasonable and whether its conclusions are in accordance with the evidence." § 40–6–115(3), 11 C.R.S. (1997); *see also Boulder Airporter, Inc. v. Rocky Mountain Shuttlines, Inc.*, 918 P.2d 1118, 1120 (Colo.1996). Questions of law are to be decided by the courts, and PUC rulings in this regard, while entitled to respectful consideration, are not controlling. *See* § 40–6–115(3)("the district court shall decide all relevant questions of law"); *Union Rural Elec. Ass'n Inc. v. Public Utils. Comm'n*, 661 P.2d 247, 251 (Colo.1983).

One of the principal areas of contention between the parties to this case involves the interrelationship between PURPA and general contract law. Phoenix argues that, under PURPA, the PUC had limited jurisdiction to review the 1993 Amendment solely for the purpose of determining whether it benefited ratepayers or whether, under the Moratorium Decision, it exacerbated the capacity problem. The PUC argues, on the other hand, that PURPA did not even become applicable until the PUC determined whether the 1993 Amendment was the same contract as the one approved in 1988.

We agree with the PUC. Before considering the PUC's obligations and restrictions under PURPA and the Moratorium Decision, we must first determine whether the 1993 Amendment in fact represents the same contract to which the PUC granted the grandfathered rights. Hence, the case first presents a question of contract law: namely, whether the 1993 Amendment created a new contract, or whether it related back to and reaped benefits afforded to the 1988 Agreement.

■ We look then to Colorado contract law to answer the question. Under contract law, if the 1993 Amendment works a novation of the 1988 Agreement, it will be deemed to constitute a new contract. A novation extinguishes a previously existing contract by substituting a new contract or obligation. *See Moffat County State Bank v. Told*, 800 P.2d 1320, 1323 (Colo.1990). There are four requirements for a novation: (1) a previous valid contract, (2) agreement between the parties to abide by the new contract, (3) a valid new contract, and (4) extinguishment of the old contract by substitution of the new one.[9] *See id.* The parties need not expressly manifest their intent to accomplish a novation, but a novation may be inferred from the facts and circumstances surrounding the transaction. *See id.*

In this case, the 1988 Agreement represents the previous valid contract sufficient to meet the first requirement of the novation test. The 1993 Amendment constitutes an agreement between PSCo and Phoenix, binding on both parties, satisfying the second requirement. The controversy concerns whether the 1993 Amendment created a new contract, thereby superseding the old one, or whether it merely amended the 1988 Agreement.

■ In *Told*, this court noted that evidence of a novation exists when "the new contract is so radically different from the old one that it necessarily supersedes it as an entirety." *See id.* (quoting *Elliott v. Whitney*, 215 Kan. 256, 524 P.2d 699, 704 (1974)).

9. We do not believe that the change in entity from Montrose to Phoenix represents a true change of parties. The concept of novation does not turn on the question of whether the parties have changed. Rather novation may apply to "any new contract entered into for the purpose and with the effect of dissolving an existing obligation, whether or not accompanied by a change of parties." 58 Am.Jur.2d *Novation* § 3 (1989); *see also, Colowyo Coal Co. v. City of Colorado Springs*, 879 P.2d 438, 443 (Colo.App.1994)(analyzing whether proposed amendments to a contract constitute a novation and implicitly assuming that the original parties could effect a novation); *Lampley v. Celebrity Homes, Inc.*, 42 Colo.App. 359, 594 P.2d 605, 607 (1979) (assuming a novation could exist without a new party and quoting Black's Law Dictionary to the effect that "[a] novation is defined as a substitution of a new contract between the same or different parties").

We conclude that if the essential elements or terms of the contract have been transformed, a new contract will be deemed to supersede the old. The specific facts surrounding the contractual relationship dictate whether or not terms are essential to the agreement. *See, e.g., American Mining Co. v. Himrod–Kimball Mines Co.,* 124 Colo. 186, 190, 235 P.2d 804, 807 (1951)(noting that what constitutes "essential terms" varies widely among jurisdictions and should be determined in each case from the particular circumstances of the transaction); *Federal Lumber Co. v. Wheeler,* 643 P.2d 31, 36 (Colo.1981)(finding that the house built by a contractor differed so greatly from that specified in the original plan that the original plan did not constitute a contract between the parties because it did not contain the essential terms of the contract for the resulting house).

Phoenix argues that the only essential terms of the contract were price,[10] capacity and term. Even if that were the correct analysis, we observe that both price and capacity have changed between the 1988 Agreement and the 1993 Amendment. The record, however, reflects that many more of the changed contract terms are essential and of serious significance both to the parties and to the PUC. *See, e.g., Re Jersey Cent. Power & Light Co.,* 143 Public Util. Rep. 4th, 188, 194 (May 11, 1993)(rejecting amendments to a previously approved QF power purchase agreement because a change in location and facility type were not "in conformity with the scope" of the regulatory commission's previous approval). Further, we view the proper analysis as one that is more expansive. When viewing the 1993 Amendment as a whole, we note that virtually every contract term is altered, albeit some more significantly than others, with the result that the 1993 Amendment differs radically from the 1988 Agreement.

The 1988 Agreement contemplated a category 4C [11] water-powered facility, dependent upon the flow of the river for capacity availability, classified under PURPA as a small power production facility and located in Montrose, Colorado. The 1993 Amendment contemplated a category 4A natural gas-fired facility, offering a steady capacity with greater dispatchability, classified under PURPA as a cogeneration facility, located in Greeley, Colorado, and also servicing the UNC campus with its recaptured waste heat.

The Greeley location is much closer to PSCo's load centers, which proximity increases the reliability of the generation. Further, the gas-fired plant is capable of providing greater dispatch control than the hydro-electric plant. Dispatch control enhances reliability of supply and may improve economic efficiency in operation. Reliability and economic efficiency are important issues between the parties and are proper areas of concern to the PUC. As stated above, the category 4A dispatchability feature triggers a different, higher tariffed rate. In testimony before the PUC, the staff explained that it harbors special concerns about the pricing structure for category 4A plants. Specifically, the PUC described what it termed a "fundamental flaw" with the category 4A QF's regarding the under-utilization of dispatchable QF's below an 80% factor. Hence, while it cannot be said definitively that these changes create a better or worse deal for PSCo and ratepayers, they clearly present substantial and important considerations affecting the basis of the bargain between the parties.

We also note, as did the ALJ, that the proposed heating and cooling of the UNC campus creates what could be considered a subsidization by ratepayers of the cost of electricity to UNC. This too represents a significant change and is an issue of legitimate concern to the PUC in examining the basic terms of the agreement.

Aside from these significant changes, additional terms were altered. Substantial con-

10. Phoenix acknowledges that the price changed but refers to the change as a "self-executing part of the agreement" because of the different tariff applicable to the new facility.

11. Category 4 facilities, as described in PSCo tariffs, consist of facilities capable of producing over 25 megawatts of capacity with mandatory dispatch. The subcategory refers to the level of dispatch. A category 4C facility offers phone dispatch of voltage only. A category 4A facility provides both automatic generation control and phone dispatch of voltage.

struction on the Montrose plant was to begin by January 1, 1993; substantial construction on the Greeley plant was to begin by June 1, 1993. Both the maintenance provisions and the security deposit were changed under the 1993 Amendment. The amount of capacity which PSCo was obligated to purchase increased under the 1993 Amendment, which in turn increased the total amount of money PSCo would pay over the term of the contract. The only relatively significant item left unchanged was the fifteen-year term with delivery beginning in September, 1994.[12] Hence, virtually all of the terms, and certainly the essential terms, of the original contract were changed.

Finally, a novation also requires extinguishment of the old contract and substitution of the new one. Phoenix argues that its previous obligation to sell electricity to PSCo, and PSCo's corresponding obligation to purchase, has not been extinguished. Phoenix cites *Colowyo Coal Co. v. City of Colorado Springs*, 879 P.2d 438 (Colo.App.1994) for the proposition that mere modification of certain contract terms will not accomplish a novation. In *Colowyo*, a coal mining company entered into a long-term contract with the city of Colorado Springs to supply coal for its electrical power generation plants. Eleven years into the contract, the parties agreed to reduce the fixed contract price and extend the contract term. *See Colowyo*, 879 P.2d at 443. The court of appeals found that the later amendments evidenced an intent to modify rather than replace the existing contract. *See id.* The court considered both the fact that the contract language described an intent to amend and restate the original contract, and the fact that only two of the contract terms were altered. *See id.* The court also noted that a contract's meaning must be gleaned from the entire document, rather than from isolated portions. *See id.* at 445.

In this case, far more than just two contract terms were altered, and all amendments predated the beginning of performance of any existing obligations. We agree

with the district court that considering the 1993 Amendment as a whole, the PUC made a just and reasonable determination that the 1993 Amendment created a new contract. Accordingly, because we agree that the 1993 Amendment represents a different contract from the 1988 Agreement, it is not entitled to the grandfathered status of the 1988 Agreement.

III.

Phoenix further argues that even if the 1993 Amendment creates a new contract, then the PUC must calculate and assign to the new contract PSCo's 1993 avoided cost purchase price and enforce this new contract. Phoenix claims that under PURPA and the Colorado QF Rules, Phoenix has a right to sell QF energy and capacity to PSCo, and a right to be paid the avoided cost purchase price applicable to the year in which the contract is executed.

This argument overstates any rights of Phoenix regarding the sale of QF power. The PUC has previously rejected the proposition that QF's have an absolute right to sell QF power to utilities. First, in its Moratorium Decision, the PUC specifically found that the decision to allow a temporary suspension of PSCo's obligation to purchase QF capacity did not violate PURPA. *See* Dec. No. C87–1690. The Moratorium Decision also reinforced the PUC's own Rule 4.503 authorizing the PUC to relieve PSCo of its obligation to purchase QF power where proposed contracts create safety, capacity or reliability problems. *See id.* The time for challenging that decision has passed, and the validity of the conclusions underlying that decision are not before the court.

Second, the PUC, in Decision Number C88–726, established and approved a bidding process for setting QF avoided costs and obtaining new QF power. In Decision Number C88–726, the PUC recognized that certain QF developers were in the process of negotiations with PSCo. The PUC provided that if those developers had not reached agreement before December 31, 1988, then

---

**12.** Although as we noted earlier, this delivery date differs from the 1988 Agreement because of

the 1991 Amendment.

they, along with any other new QF developers, were required to follow the new bidding procedures. *See* Dec. No. C88–726. Since we have concluded that the 1993 Amendment created a proposed new contract as of 1993, that new contract must comply with the bidding process because it has no grandfathered rights.

In Decision No. C88–726, the PUC again specifically addressed and rejected the argument that the bidding procedures violated PURPA and its related regulations. Indeed FERC has found that the use of bidding procedures for establishing QF avoided costs is consistent with PURPA. *See Southern California Edison Co.*, 70 FERC ¶ 61,215, 1995 WL 169000 (1995)(requiring the California Public Utilities Commission to allow all potential energy producers to compete with QF's in a bidding system for establishing avoided costs); *see also, Freehold Cogeneration Assocs. v. Board of Regulatory Commr's*, 44 F.3d 1178, 1182 (3d Cir.1995) (referring to New Jersey Board of Regulatory Commissioners' decision to establish bidding procedures for QF contracts). Again, that PUC decision is not before us.

In the case that is before us, the PUC found that if Phoenix wished to sell its QF energy and capacity under the new 1993 Agreement, it must submit its contract into the bidding process just like any other potential developer. The PUC found that. "the effective procedure for determination of Public Service's avoided costs" under the Phoenix contract was the bidding process. Dec. No. C95–245. Further, the PUC concluded that "PURPA, the FERC QF Rules, and the [Colorado QF Rules] do not compel Public Service to purchase all capacity and energy offered to it by [Phoenix]" nor do they require the PUC to set a 1993 avoided cost purchase price for Phoenix outside the established bidding process. *Id.*

We agree with the district court that this conclusion by the PUC is just and reasonable. *See Lucero v. Climax Molybdenum Co.*, 732 P.2d 642, 645–46 .(Colo.1987)(noting that courts should give deference to the statutory interpretation of an agency charged with administration of a statute); *Public Utils. Comm'n v. Grand Valley Rural Power*

*Lines, Inc.*, 167 Colo. 257, 261, 447 P.2d 27, 28 (1968)(holding that the PUC is the proper authority for interpreting its own rules and decisions and such interpretation will not be overturned unless clearly erroneous).

Accordingly, as we have concluded that the 1993 Amendment constituted a new contract, and the PUC has previously established a bidding procedure the validity of which is not before the court for all proposed QF contracts not exempted from the moratorium, the PUC correctly ruled that the new contract must follow the bidding procedures.

## IV.

The 1993 Amendment diverged so significantly from the 1988 Agreement as to constitute a new contract that was not entitled to the grandfathered rights applicable to the 1988 contract. That new contract must be submitted into the bidding process along with other proposed QF contracts. We therefore affirm the district court's ruling upholding the PUC's decisions.

SCOTT, J., dissents.

Justice SCOTT dissenting:

This case requires that we decide whether the Public Utilities Commission (PUC) acted within its authority when, by order, it excused the Public Service Company of Colorado (PSCo) from its obligation to purchase electricity under a contract with Phoenix Power Partners, LP (Phoenix). Under the contract, as amended or substituted in 1993, PSCo agreed to a locked-in price and undertook a business risk that market prices would be lower at the time of delivery and, conversely, stood to benefit if prices were to rise. At the same time, of course, the contract represented a promise upon which Phoenix relied in incurring substantial costs pursuant to federal policies intended to create new sources of energy to fuel our nation's energy independence. It was within this context that the PUC issued its order rejecting the contract between Phoenix and PSCo, ending Phoenix's "grandfathered" contract rights under the PUC's earlier moratorium order.

In my view, because we are reviewing an order of the PUC, we must "determine whether the Commission has regularly pursued its authority ... and whether the decision of the Commission is just and reasonable and whether its conclusions are in accordance with the evidence." § 40–6–115(3), 11 C.R.S. (1997). Pursuant to our statutory charge, I view our role as requiring a different mode of analysis than the approach employed by the majority. Accordingly, I respectfully dissent from the majority's conclusion that the 1993 Amendment to the contract between Phoenix and PSCo were so drastic that "the 1993 Amendment is not entitled to the grandfathered status of the 1988 Agreement," maj. op. at 366, so as to uphold the PUC's decision. I am unable to conclude by its order that "the PUC made a just and reasonable determination that the 1993 Amendment created a new contract," *id.*, so I respectfully dissent.

I understood the question before us to be whether the PUC applied the correct analytic framework—namely, the law of contracts—and set forth a just and reasonable basis for its conclusion that Phoenix was no longer entitled to the benefit of the grandfather rules under the PUC's earlier Moratorium Decision. As I read that decision and the PUC's own Rule 4.503, the PUC is authorized to "relieve[ ] PSCo of its obligation to purchase QF power where proposed contracts create safety, capacity or reliability problems," maj. op. at 367. The order before us, however, fails to set forth a safety, capacity, or reliability basis for the PUC's decision.

Contrary to the majority, I do not think this case "first presents a question of contract law," and that "[w]e look then to Colorado contract law to answer the question." *Id.* at 364. Instead, I believe this case turns on administrative law principles and, consequently, I believe the PUC was obliged to explain why it decided that under the 1993 Amendment Phoenix cannot " 'compel Public Service to purchase all capacity and energy offered to it by [Phoenix]' nor [must] the PUC ... set a 1993 avoided cost purchase price for Phoenix outside the established bidding process." *Id.* at 368.

Thus, I would reverse the ruling of the district court and remand with instructions that it return the matter to the PUC for further proceedings in which the PUC could have the opportunity to set forth the basis for its decision in light of the goals of its grandfather policy or under some other reasoned framework. I believe that even if the PUC was correct to apply contract doctrine to this dispute, it was nonetheless required to explain why the 1993 Amendments were so material as to go to the essence of the bargain between Phoenix and PSCo so as to excuse PSCo from performing under the 1988 and 1993 Amendments.

I.

A reviewing court generally must defer to the judgment of an administrative agency, such as the PUC, where the agency's decision is supported by substantial evidence, at least when the decision in question is within the agency's field of expertise. *See Silverado Communication Corp. v. Public Utils. Comm'n*, 893 P.2d 1316, 1319 (Colo.1995). However, the court must satisfy itself that the agency has examined the relevant facts and articulated a reasoned basis for its conclusions. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); *Simms v. National Highway Traffic Safety Admin.*, 45 F.3d 999, 1002 (6th Cir. 1995); *see also Silverado Communication*, 893 P.2d at 1319 (agency decisions must be reasonable as well as supported by evidence).

Without an explanation of the rationale underlying the agency's decision, a reviewing court is unable to fulfill its duty to evaluate whether the decision is the product of reasoned decisionmaking and is just and reasonable. *See Simms*, 45 F.3d at 1004 (agency's decision will be upheld only if the reviewing court can discern a reasoned path from the facts before the agency to the decision it reached); *Greater Boston Television Corp. v. Federal Communications Comm'n*, 444 F.2d 841, 851 (D.C.Cir.1970) (need for meaningful judicial review "calls for insistence that the agency articulate with reasonable clarity its reasons for decision"); *Hoyl v. Babbitt*, 927 F.Supp. 1411 (D.Colo.1996) (duty of court

reviewing agency action is to ascertain whether agency examined relevant data and articulated rational connection between facts found and decision made).

For this reason, the oft-cited maxim that an agency's decision will be upheld if it is supported by substantial evidence in the record is somewhat misleading. Judges must not substitute their own views for the judgment of expert administrative decisionmakers, and an agency decision is therefore to be affirmed even if an appellate court would reach a different conclusion based on the evidence in the record. However, the agency must explain how it reached its decision in order for the judiciary to determine whether the decision—and the process used to reach it—is valid. *See Ute Elec. Ass'n, Inc. v. Public Utils. Comm'n,* 760 P.2d 627, 648 (Colo.1988) ("in the absence of sufficient investigation into pertinent considerations, the order is arbitrary, capricious, and invalid"); *see also City of Montrose v. Public Utils. Comm'n,* 197 Colo. 119, 123, 590 P.2d 502, 505–06 (1979).

While I suspect that the PUC might well be able to justify its decision, the Commission has not yet demonstrated that it has taken a "hard look" at the relevant factors. In support of its conclusion in this case, the PUC points to numerous changes in the contract between Phoenix and PSCo and argues that under general principles of contract law, a new agreement was formed as a result. However, the PUC fails to explain why the 1993 Amendments were material to the economic relationship or bargain between Phoenix and PSCo. Nor does the PUC indicate why the changes in the 1993 Amendments should be analyzed not based on factors set forth in its Moratorium Decision—safety, capacity or reliability problems—but by the same standards used by courts in resolving contract disputes between private parties.

Phoenix argues that instead of attempting to decide whether the contract is "new" or merely an amended version of the earlier agreement, the test of eligibility for grandfather protection should be whether the amended deal is consistent with the purpose and language of the moratorium order. The moratorium was adopted in order to deal with the problem of excess capacity, and the PUC grandfathered certain QF deals under negotiation at the time the moratorium was imposed provided that they did not aggravate the capacity problem. The PUC went on to approve a number of amendments to other grandfathered contracts, and Phoenix contends that because the same capacity would be provided under the amendments it proposed in 1993 as under its earlier arrangement with PSCo, the 1993 Amendments should likewise be approved.

In my view, the PUC's decision is not responsive to the reasoning offered by Phoenix. Like the ALJ, the PUC merely pointed to the number and variety of changes to the original deal between Phoenix and PSCo and noted that the power to be provided would be more expensive than under the bidding rules. The only other factor cited by the ALJ or PUC to justify rejection of the proposed changes was the large difference between the locked-in 1987 rate and the market rate in 1993. The ALJ candidly acknowledged that he found it "impossible to ignore the fact that the electricity proposed to be sold will be more expensive than any other firm ... electricity available in Colorado and several surrounding states."

The fact is, though, that the ALJ and the PUC were *required* to ignore the difference between the locked-in rate and the current market price of electricity. PURPA and the implementing regulations promulgated by FERC entitle the developer of a qualified facility to sell power at locked-in rates established at the project's inception. *See* 18 C.F.R. § 292.304(d)(2) (1997); *Freehold Cogeneration Assoc. v. Board of Regulatory Comm'rs,* 44 F.3d 1178, 1191–93 (3d Cir. 1995); *Independent Energy Producers, Inc. v. California Public Utils. Comm'n,* 36 F.3d 848, 858 (9th Cir.1994). Likewise, the PUC rules adopted to carry out its obligations under PURPA expressly assure the right of a supplier to "lock in" rates for a qualified facility. *See* 4 C.C.R. § 723–19, Rule 3.5072.

While the ALJ and PUC may disagree with the judgment made by Congress and FERC in adopting a regulatory scheme that allows developers of qualified facilities to force utilities and their ratepayers to buy

power at prices that may exceed market rates at the time of delivery, they must abide by the policy choice embodied in the statute and rules. Thus, to the extent that the ALJ and the PUC relied on the increasingly large spread between the 1987 avoided cost rate and the market price for electricity as a reason to reject the 1993 Amendments, their decisionmaking was premised on a factor they were not authorized to consider.

As for the comparatively large number and degree of changes contemplated by the 1993 Amendments, the PUC simply does not explain why they are material and thus, as a consequence, why the 1993 Agreement is no longer enforceable under the PUC's Moratorium Decision. Phoenix argues that the only aspect of the deal that could be considered material to the legitimate regulatory interests of the PUC is capacity, which was not altered. To this argument the PUC offers no cogent response.[1]

While I do not think the PUC was bound to adopt the approach advanced by Phoenix, it must explain why contract rules should apply to the exclusion of a functional test designed to assess the amended arrangement in light of the policy goals identified by the PUC in establishing the bidding rules and accompanying grandfather provisions.

## II.

Even if the PUC were to conclude that contract rules should be applied to evaluate the significance of amendments to a grandfathered contract—and I believe it might reach such a conclusion based on sound reasoning—its decision that the amended terms constitute a new contract cannot be reviewed in a vacuum. The materiality of a contract term must be assessed in context. *Cf.* Restatement (Second) of Contracts § 241 (standards for assessing materiality of breach); *Pittsburgh Nat'l Bank v. Abdnor*, 898 F.2d 334, 338 (3d Cir.1990) (materiality of breach turns on multi-factor test requiring examina-

tion of expectations of parties at the time original contract was formed).

Thus, while a change in technology, geographic location, and price might be material in one context, they might not be important in another. For example, the technology employed to generate energy might be irrelevant from the point of view of a residential utility customer who simply wants to make sure the porch lights turn on when the appropriate switch is flipped. On the other hand, the technology used might be crucial to a construction company negotiating changes in a contract to help Phoenix build the facility, because construction of a water-powered plant might require a very different set of skills and materials than a natural gas-fired cogeneration plant.

The essence of the bargain between Phoenix and PSCo arguably remained the same under the proposed 1993 Amendments as it was under the PUC-approved 1991 amendments, namely, the agreement for Phoenix to sell 43.5 megawatts of QF capacity to PSCo over a fifteen-year period. Indeed, neither the 1987 contract nor the amended version proposed in 1993 appears to attach much significance to the location of the project or the technology to be used. While the original version includes an attachment that describes the project as a hydroelectric facility near Montrose, nowhere does it require the use of any particular technology or placement in any particular location. In fact, the 1987 contract requires only that the power be generated by a "qualifying facility."

The changes proposed in 1993 would substitute an alternative description of the facility's location and technology, but like the 1987 version of the contract, the 1993 Amendments contain no provision that appears to create any right or obligation based on technology or geography. The changes in location and technology may or may not have been material, but their importance is by no means obvious. The significance of any particular contractual term must be assessed in

---

1. Although the moratorium order reserved the PUC's right to review any grandfathered contract reached under its terms, the PUC approved several other contracts that also included subsequent amendments. The PUC acknowledges as much, but asserts that· it has never approved

amendments requiring so many changes with such drastic differences, e.g., in technology and geographic location. Again, though, the PUC must explain why these changes are important in the context of its regulatory policies or the expectations of the parties to the contract.

the context of the expectations of the parties,[2] and the record does not reflect how the availability of 43.5 megawatts generated by a hydroelectric facility near Montrose was different, from the point of view of PSCo or ratepayers, than the availability of the same amount of electricity from a cogeneration facility in Greeley.[3]

## III.

We are obliged to defer to the PUC's expert judgment concerning the significance of the changes in the power contract between Phoenix and PSCo, but unless the PUC is required to explain the reasons for its decision in sufficient detail to allow for meaningful judicial review, I fear we have given the PUC far more than the deference due to an administrative agency. Moreover, to the extent that the PUC made legal determinations concerning the implications of the 1993 Amendments under contract law, I am not convinced that these determinations were correct under Colorado contract law. In any event, I think it incorrect to analyze this controversy as a contract case rather than a dispute that calls for judicial review of the decisionmaking process of an administrative agency. Therefore, I respectfully dissent.

---

**2.** At this stage, PSCo takes the position that the PUC's decision should be upheld and that it should be released from any obligation to perform under the 1993 amendments. At the time the 1993 changes were submitted to the PUC, however, PSCo had no objection to approval of the amendments. In this context, the expectations of the parties must be assessed in terms of what PSCo and Phoenix reasonably would have considered material at the time the 1988 contract was made in order to determine whether the 1993 amendments altered the original bargain in any fundamental way.

**3.** The majority analyzes the changes resulting from the 1993 Amendment in contract terms and attempts to decide whether they were so significant as to constitute a "novation." I take issue with this terminology, because a novation re-

quires the substitution of one or more parties to the original contract, not the substitution of a new performance. *See* Restatement (Second) of Contracts § 280 (1979) ("A novation is a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original contract."). Our decision in *Moffat County State Bank v. Told*, 800 P.2d 1320 (Colo. 1990), cited by the majority in its novation discussion, is not to the contrary, because in that case the change in parties was not in dispute. *Moffat County State Bank* merely analyzed the other elements of a novation. Whatever the terminology, I do not think that the PUC has shown that the 1993 changes were material or altered the benefit of the bargain PSCo entered into with Phoenix, so I would remand for further proceedings on this issue.